**Slip Op. 01-69**

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____ :
:
NSK LTD. and NSK CORPORATION,                :
KOYO SEIKO CO., LTD. and KOYO                :
CORPORATION OF U.S.A., NTN BEARING           :
CORPORATION OF AMERICA, NTN CORPORATION,:
AMERICAN NTN BEARING MANUFACTURING           :
CORPORATION, NTN DRIVESHAFT, INC.            :
and NTN-BOWER CORPORATION,                   :
:
        Plaintiffs and            :
        Defendant-Intervenors,    :
:
NIPPON PILLOW BLOCK SALES CO. LTD. and :
FYH BEARING UNITS USA INC.,                  :
:
        Plaintiffs,               :
:
      v.                             : Consol. Court No.
: 97-02-00216
UNITED STATES,                               :
:
        Defendant,                :
:
        and                       :
:
THE TORRINGTON COMPANY,                      :
:
        Defendant-Intervenor      :
        and Plaintiff.            :
_____:

Plaintiffs and defendant-intervenors, NSK Ltd. and NSK Corporation (collectively "NSK"), Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo"), NTN Bearing Corporation of America, NTN Corporation, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc. and NTN-Bower Corporation (collectively "NTN"), and plaintiffs, Nippon Pillow Block Sales Co. Ltd. and FYH Bearing Units USA Inc. (collectively "NPB"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of</u>

Antidumping Duty Administrative Reviews ("Final Results"), 62 Fed. Reg. 2081 (Jan. 15, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, and Singapore; Amended Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 14,391 (Mar. 26, 1997). Defendant-intervenor and plaintiff, The Torrington Company ("Torrington"), also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of Commerce's Final Results.

Specifically, NSK argues that Commerce erred in: (1) calculating constructed value ("CV") profit; (2) its application of level-of-trade ("LOT") adjustments to normal value ("NV"); (3) including its zero-value United States transactions in the margin calculations; (4) failing to include inventory carrying costs in the constructed export price ("CEP") offset when it matches CEP sales to CV; and (5) failing to find that NSK successfully rebutted the presumption of affiliation between itself and its supplier.

Koyo contends that Commerce erred in: (1) failing to grant an LOT adjustment; and (2) failing to exclude sales made out of the ordinary course of trade from the home-market database. Koyo subsequently abandoned its claim regarding Commerce's failure to grant an LOT adjustment.

NTN contends that Commerce erred in: (1) failing to exclude sales made out of the ordinary course of trade from the home-market database; (2) making certain adjustments to the starting price of CEP and denying a price-based LOT adjustment for CEP sales; (3) recalculating United States indirect selling expenses without regard to LOT; (4) determining CEP without regard to LOT; and (5) refusing to use NTN's affiliated-party sales in its calculation of NV.

NPB contends that Commerce erred in: (1) finding that NPB failed to correctly indicate whether a housed bearing model was further manufactured in the United States during the period of review; and (2) applying total facts available.

Torrington contends that Commerce erred in: (1) accepting Koyo's home-market billing adjustments; (2) accepting Koyo's home-market rebates; (3) accepting NTN's home-market billing adjustments; and (4) accepting NSK's home-market rebates.

**Held:** NSK's USCIT R.56.2 motion is denied in part and granted in part. Koyo's USCIT R.56.2 motion is granted. NTN's USCIT R.56.2 motion is denied. NPB's USCIT R.56.2 motion is denied.

Torrington's USCIT R.56.2 motion is denied.  The case is remanded to Commerce to: (1) exclude any transactions that were not supported by consideration from NSK's United States sales database and to adjust the dumping margins accordingly; (2) reconsider the issue of NSK's relationship to its supplier; (3) reconsider its determination that a certain model of Koyo's was outside the ordinary course of trade; and (4) reconsider its determination that a certain home-market ball bearing of Koyo's could be compared to United States sales because it is a foreign like product and to clearly articulate the basis of its determination.

[NSK's motion is denied in part and granted in part. Koyo's motion is granted. NTN's motion is denied. NPB's motion is denied. Torrington's motion is denied.  Case remanded.]

Dated: June 6, 2001

Lipstein, Jaffe & Lawson, L.L.P. (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for NSK.

Powell, Goldstein, Frazer & Murphy LLP (Peter O. Suchman, Neil R. Ellis, Elizabeth C. Hafner and Ronald E. Minsk)for Koyo.

Barnes, Richardson & Colburn (Donald J. Unger and Kazumune V. Kano) for NTN.

Michael J. Brown, Esq. for NPB.

Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Thomas Fine, Patrick V. Gallagher, Myles S. Getlan, David R. Mason and Dean A. Pinkert, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for Torrington.

## OPINION

**TSOUCALAS, Senior Judge:**     Plaintiffs and defendant-intervenors, NSK Ltd. and NSK Corporation (collectively "NSK"), Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively

"Koyo"), NTN Bearing Corporation of America, NTN Corporation, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc. and NTN-Bower Corporation (collectively "NTN"), and plaintiffs, Nippon Pillow Block Sales Co. Ltd. and FYH Bearing Units USA Inc. (collectively "NPB"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews ("Final Results"), 62 Fed. Reg. 2081 (Jan. 15, 1997), as amended, Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, and Singapore; Amended Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 14,391 (Mar. 26, 1997). Defendant-intervenor and plaintiff, The Torrington Company ("Torrington"), also moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging certain aspects of Commerce's Final Results.

Specifically, NSK argues that Commerce erred in: (1) calculating constructed value ("CV") profit; (2) its application of level-of-trade ("LOT") adjustments to normal value ("NV"); (3)

including its zero-value United States transactions in the margin calculations; (4) failing to include inventory carrying costs in the constructed export price ("CEP") offset when it matches CEP sales to CV; and (5) failing to find that NSK successfully rebutted the presumption of affiliation between itself and its supplier.

Koyo contends that Commerce erred in: (1) failing to grant an LOT adjustment; and (2) failing to exclude sales made out of the ordinary course of trade from the home-market database. Koyo subsequently abandoned its claim regarding Commerce's failure to grant an LOT adjustment.

NTN contends that Commerce erred in: (1) failing to exclude sales made out of the ordinary course of trade from the home-market database; (2) making certain adjustments to the starting price of CEP and denying a price-based LOT adjustment for CEP sales; (3) recalculating United States indirect selling expenses without regard to LOT; (4) determining CEP without regard to LOT; and (5) refusing to use NTN's affiliated-party sales in its calculation of NV.

NPB contends that Commerce erred in: (1) finding that NPB failed to correctly indicate whether a housed bearing model was further manufactured in the United States during the period of review ("POR"); and (2) applying total facts available.

Torrington contends that Commerce erred in: (1) accepting Koyo's home-market billing adjustments; (2) accepting Koyo's home-market rebates; (3) accepting NTN's home-market billing adjustments; and (4) accepting NSK's home-market rebates.

### BACKGROUND

This case concerns the sixth review of the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported to the United States from Japan during the review period of May 1, 1994 through April 30, 1995. On July 8, 1996, Commerce published the preliminary results of the subject review. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Thailand and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews, Termination of Administrative Reviews, and Partial Termination of Administrative Reviews ("Preliminary Results"), 61 Fed. Reg. 35,713. Commerce issued the Final Results on January 15, 1997, see 62 Fed. Reg. 2081, and the Amended Final Results on March 26, 1997, see 62 Fed. Reg. 14,391.

Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No.

103-465, 108 Stat. 4809 (1994) (effective January 1, 1995).  See
Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir.
1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA
amendments)).


## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19
U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).


## STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an
antidumping administrative review unless it is "unsupported by
substantial evidence on the record, or otherwise not in accordance
with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994); see NTN Bearing
Corp. of Am. v. United States ("NTN Bearing"), 24 CIT ___, ___, 104
F. Supp. 2d 110, 115-16 (2000) (detailing Court's standard of
review in antidumping proceedings).


## DISCUSSION

### I.   Commerce's CV Profit Calculation for NSK

#### A.   Background

For this POR, Commerce used CV as the basis for NV "when there
were no usable sales of the foreign like product in the comparison
market."  Preliminary Results, 61 Fed. Reg. at 35,718.  Commerce

calculated the profit component of CV using the statutorily preferred methodology of 19 U.S.C. § 1677b(e)(2)(A) (1994). See Final Results, 62 Fed. Reg. at 2113. Specifically, in calculating CV, the statutorily preferred method is to calculate an amount for profit based on "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review . . . in connection with the production and sale of a foreign like product [made] in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(2)(A).

In applying the preferred methodology for calculating CV profit, Commerce determined that "the use of aggregate data that encompasses all foreign like products under consideration for NV represents a reasonable interpretation of [§ 1677b(e)(2)(A)] and results in a practical measure of profit that [Commerce] can apply consistently in each case." Final Results, 62 Fed. Reg at 2113. Also, in calculating CV profit under § 1677b(e)(2)(A), Commerce excluded below-cost sales from the calculation which it disregarded in the determination of NV pursuant to § 1677b(b)(1) (1994). See id. at 2114.

## B.   Contentions of the Parties

### 1.   NSK's Contentions

NSK contends that Commerce defined "foreign like product" for

purposes of the CV profit calculation in a manner contrary to the statutory definition of the term and well-established agency practice. See NSK's Mem. P. & A. Supp. Mot. J. Agency R. ("NSK's Mem.") at 12.   In particular, NSK asserts that 19 U.S.C. § 1677b(e)(2)(A) requires that Commerce first try to calculate CV profit for imported merchandise based on actual profit amounts incurred in the home-market production and sale of "foreign like product," that is, model or family products, that match each bearing model sold in the United States.  See id.

NSK notes that 19 U.S.C. § 1677(16) (1994) defines "foreign like product" by establishing three distinct categories of products for model-matching purposes. See id. at 13.  The first category of merchandise is identical merchandise, the next category is nonidentical merchandise made by the same producer in the same country and is similar in value to the merchandise under investigation, and the third category is merchandise made by the same producer in the same country and used for the same purposes as the merchandise under investigation.  See id.  NSK asserts that once Commerce finds merchandise in one category, merchandise in the subsequent categories can never be considered foreign like product because § 1677(16) directs Commerce to determine foreign like product in the first of the listed categories. See id. at 13-14. NSK argues, therefore, that since the plain language of § 1677(16)

clearly creates a descending hierarchy for selecting foreign like product, Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 457 U.S. 837 (1984) dictates that the Court, as well as Commerce, must give effect to the unambiguously expressed intent of Congress and, thus, the reasonableness of Commerce's interpretation of 19 U.S.C. § 1677b(e)(2)(A) is irrelevant. See id. at 12-13.

NSK also maintains that the legislative history of the URAA confirms that Commerce should calculate CV profit on a model or family basis when using the preferred methodology under 19 U.S.C. § 1677b(e)(2)(A). See id. at 15. NSK notes that when Commerce revised its regulations to conform to the URAA, in particular 19 C.F.R. § 351.405, the agency specified it would use "'an aggregate calculation that encompasses all foreign like products under consideration for normal value.'" Id. (quoting Antidumping Duties; Countervailing Duties; Final Rule ("Final Regulations"), 62 Fed. Reg. 27,296, 27,359 (May 19, 1997)). NSK further notes that Commerce found this method of calculating CV profit to be "'consistent with the Department's method of computing SG&A and profit under the pre-URAA version of the statute, and, while the URAA revised certain aspects of the SG&A and profit calculation, we do not believe that Congress intended to change this particular aspect of our practice.'" Id. Nevertheless, NSK claims that contrary to Commerce's finding, the URAA legislative history makes

clear that the current preferred methodology for calculating CV profit is not consistent with Commerce's pre-URAA methodology. See id. The URAA legislative history, according to NSK, first recites the pre-URAA law, 19 U.S.C. § 1677b(e)(1)(B) (1988), with reference to profit amounts based on the same general class or kind as the merchandise under investigation, then announces that 19 U.S.C. § 1677b(e)(2)(A) (1994) "'establishes <u>new</u> methods of calculating SG&A expenses and profits consistent with methods provided for in the [URAA].'" <u>Id.</u> at 15-16 (quoting Statement of Administrative Action ("SAA"),[1] H.R. Doc. 103-316, at 839 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040) (emphasis added)). NSK specifically notes that the new § 1677b(e)(2)(A) "'establishes as a general rule that Commerce will base amounts of SG&A expenses and profits only on amounts incurred and realized in connection with sales in the ordinary course of trade of the <u>particular</u> merchandise in question (foreign like product).'" <u>Id.</u> at 16 (quoting SAA at 839) (emphasis

---

[1]   The Statement of Administrative Action ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Doc. 103-316, at 656 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." <u>Id.</u>; <u>see also</u> 19 U.S.C. § 3512(d) (1994) ("The statement of administrative action approved by the Congress . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

added). NSK, therefore, argues that the URAA legislative history directly contradicts Commerce's position and demonstrates Congress' clear intent to alter the preferred basis on which Commerce calculates CV profit. See id.

NSK further notes that after taking into account changes in nomenclature of the URAA, the first alternative methodology for CV profit, 19 U.S.C. § 1677b(e)(2)(B)(i), is nearly identical to the pre-URAA CV profit methodology, 19 U.S.C. § 1677b(e)(1)(B), except that sales at issue do not have to be in the ordinary course of trade. See id. NSK also notes that the URAA legislative history provides that "'[w]ith respect to alternative (1), this methodology is consistent with the existing practice of relying on a producer's sales of products in the same'" general class or kind of merchandise. Id. (quoting SAA at 840). NSK, therefore, maintains that if § 1677b(e)(1)(B) is meant to be consistent with Commerce's pre-URAA practice, then § 1677b(e)(2)(A) is necessarily meant to be different. See id. at 17.

### 2. Commerce's Contentions

In response, Commerce asserts that it applied a reasonable interpretation of 19 U.S.C. § 1677b(e)(2)(A) and properly based CV profit for each respondent, including NSK, upon the actual profit data of that respondent. See Def.'s Mem. in Partial Opp'n to Pls.'

Mots. J. Agency R. ("Def.'s Mem.") at 15-16. Although Commerce recognizes that 19 U.S.C. § 1677(16) establishes a descending hierarchy that articulates preferences for the type of foreign like product the agency must select for matching purposes, it claims that where the subject merchandise is complex and encompasses numerous characteristics for matching, the foreign like product typically embraces more that one of the § 1677(16) categories. See id. at 18. Commerce contends that the term "foreign like product" is not limited to the product which is "identical" (i.e., "model-specific") or "like" (i.e., "similar to") the subject merchandise, because if neither is available, merchandise of the same "general class or kind" as the subject merchandise will qualify as the foreign like product. See id. at 18-19.

Commerce also claims that there is no indication by reference to "a foreign like product" in 19 U.S.C. § 1677b(e)(2)(A) that Congress intended that CV profit be calculated based on merchandise that is identical or similar to the subject merchandise. See id. at 18. Commerce also notes that CV becomes available for NV only when identical or similar home-market merchandise is not available for comparison with United States sales either because there are no such home-market sales or they are below cost and, thereby, are disregarded. See id. Commerce maintains that Congress could not have intended to limit the CV profit calculation under §

1677b(e)(2)(A) to profit incurred in the production or sale of merchandise identical or similar to the subject merchandise because, in that event, the preferred method of § 1677b(e)(2)(A) would rarely be applicable.  See id. at 18-19.  Commerce, therefore, argues that since there were sales of foreign like products that were not disregarded and actual profit amounts were realized by each respondent in connection with these sales, Commerce properly applied the preferred method by aggregating those profits.  See id. at 20.  To apply an alternative methodology where there are sales of the foreign like product, according to Commerce, would virtually eliminate the statutory preference to calculate CV profit based upon § 1677b(e)(2)(A).  See id. at 21.

Moreover, Commerce disagrees with NSK's assertion that Commerce ignored the explicit hierarchy of  19 U.S.C. § 1677(16) by calculating CV profit based on profits for products from all § 1677(16) categories. See id. at 22.  Citing U.H.F.C. Co. v. United States, 916 F.2d 689 (Fed. Cir. 1990) (a pre-URAA case), and Toyota Motor Sales, U.S.A., Inc. v. United States, 22 CIT __, 15 F. Supp. 2d 872 (1998) (a post-URAA case), Commerce argues that it is simply following its practice established under pre- and post-URAA law of applying the categories set forth under § 1677(16), which defines "such or similar" merchandise (now "foreign like product"), depending upon the particular context.  See id. at 22-23.

### 3. Torrington's Contentions

In support of Commerce, Torrington first contends that 19 U.S.C. § 1677b(e)(2)(A) on its face permits a flexible application of "foreign like product" in CV profit calculations. See Torrington's Resp. to Pls.' Mems. Supp. Mots. J. Agency R. ("Torrington's Resp.") at 16. Torrington asserts that § 1677b(e)(2)(A)'s plural expression, "profits," and flexible expression, "in connection with," carries the clear meaning and intent that Commerce may calculate CV profit from multiple sales of relevant merchandise and by reference to more than one bearing "family," so long as the models in the calculation are reasonably "connected" to the particular model for which CV is being determined. See id. Torrington, therefore, argues that § 1677b(e)(2)(A) does not limit Commerce to any particular narrow product group. See id.

Torrington also contends that rules of statutory construction necessitate Commerce's broad and flexible interpretation of 19 U.S.C. § 1677b(e)(2)(A). See id. at 17. Torrington first notes that § 1677b(e)(2)(A) is the general rule and preferred basis for determining CV profit. See id. Torrington also notes that in most cases, CV forms NV only when a respondent reports insufficient sales of "foreign like product," as the term is narrowly

understood, in the ordinary course of trade.  See id.  Accordingly,
Torrington claims that if the Court construes § 1677b(e)(2)(A)
narrowly in the CV profit context, it will effectively negate the
general rule and preferred basis for CV profit calculations.  See
id.  In support of its claim, Torrington asserts that: (1) "courts
[must] strive to give effect to all provisions in a statute, so as
not to render a provision inoperative," id. (citing United States
v. Menasche, 348 U.S. 528, 538-39 (1955)); and (2) courts must also
"avoid giving statutes manifestly absurd interpretations which
literal readings would otherwise support," id. (citing United
States v. Brown, 333 U.S. 18, 27 (1948)).  Torrington argues if the
Court were to adopt NSK's position for calculating CV profit, the
Court would clearly violate both of these rules.  See id. at 17-18.

Torrington further contends that the crux of NSK's argument is
that the term "foreign like product" under  19 U.S.C. § 1677(16)
must be applied with rigid consistency in two different contexts,
namely, those for: (1) calculating price-based NV from home-market
sales of comparable merchandise, and (2) calculating CV profit.
See id. at 19.  Torrington disagrees with NSK, arguing first that
the language of 19 U.S.C. § 1677(16) clearly provides that Commerce
has discretionary authority to select among the categories of
identical  and  similar  merchandise  to  reach  a  satisfactory
determination.  See id.  In other words, Commerce has the authority

to make a satisfactory determination of what is encompassed by "foreign like product" and, therefore, it acted reasonably when it based CV profit on the sales of all foreign like products. See id. at 19-20.

Torrington also asserts that Commerce reasonably concluded that "foreign like product" can differ by context, that is, depending upon whether the dumping comparison is based on: (1) price-to-price, or (2) price-to-CV. See id. at 20. First, Torrington notes that when there are adequate home-market sales made at above-cost prices of identical or similar merchandise, there is no need to determine profit, and the application of "foreign like product" turns to model-matching issues. See id.

Torrington also argues, inter alia, that, contrary to NSK's suggestion that the Court interpret the term "a foreign like product" of 19 U.S.C. § 1677b(e)(2)(A) in all contexts as referring to a singular class of identical merchandise or to a singular bearing family, the selection of the word "a" in the statute commonly means "any," and can be "applied to more than one individual object; whereas 'the' is an article which particularizes the subject spoken of." Id. at 23 (quoting Allstate Ins. Co. v. Foster, 693 F. Supp. 886, 889 (D. Nev. 1988) (quoting, in turn, Black's Law Dictionary, 1, 1324 (5th ed. 1979)). In addition, Torrington claims that judicial precedent supports construing the

word "a" in a broader manner. See id. at 23-24. Consistent with the common meaning and judicial precedent, Torrington asserts that the Court should sustain Commerce's interpretation that "a foreign like product" can mean "any" such product and all such products combined for purposes of calculating CV profit under § 1677b(e)(2)(A). See id. at 25.

### C. Analysis

In RHP Bearings Ltd. v. United States, 23 CIT ___, 83 F. Supp. 2d 1322 (1999), this Court upheld Commerce's CV profit methodology of using aggregate data of all foreign like products under consideration for NV as being consistent with the antidumping statute. See id. at ___, 83 F. Supp. 2d at 1336. Since Commerce's CV profit methodology and the parties' arguments at issue in this case are practically identical to those presented in RHP Bearings, the Court adheres to its reasoning in RHP Bearings. The Court, therefore, finds that Commerce's CV profit methodology is in accordance with law.

### II. NSK's Zero-Value United States Transactions

NSK argues that in light of NSK Ltd. v. United States, 115 F.3d 965, 975 (Fed. Cir. 1997), the Court should remand the matter to Commerce to exclude its zero-value transactions from their margin calculations. See NSK's Mem. at 28. NSK maintains that

United States transactions at zero value, such as samples, do not constitute true sales and, therefore, should be excluded from the margin calculations pursuant to NSK. See id. The identical issue was decided by this Court in SKF USA Inc. v. United States, Slip Op. 99-56, 1999 WL 486537, *7 (June 29, 1999).

Torrington concedes that a remand may be necessary in light of NSK, but argues that further factual inquiry by Commerce is necessary to determine whether the zero-price transactions were truly without consideration. See Torrington's Resp. at 29. Torrington argues that only if the transactions are truly without consideration can they fall within NSK's exclusion. See id.

Commerce concedes that the case should be remanded to it to exclude the sample transactions for which NSK received no consideration from its United States sales databases. See Def.'s Mem. at 25.

Commerce is required to impose antidumping duties upon merchandise that "is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673(1) (1994). A zero-priced transaction does not qualify as a "sale" and, therefore, by definition cannot be included in Commerce's NV calculation. See NSK, 115 F.3d at 975 (holding "that the term 'sold' . . . requires both a transfer of ownership to an unrelated

party and consideration."). Thus, the distribution of AFBs for no consideration falls outside the purview of 19 U.S.C. § 1673. Consequently, the Court remands to Commerce to exclude any transactions that were not supported by consideration from NSK's United States sales database and to adjust the dumping margins accordingly.

### III. Commerce's Exclusion of Inventory Carrying Costs in the CEP Offset When it Matched NSK's CEP Sales to CV

In the Final Results, Commerce "regard[ed] the inventory carrying costs [NSK] incurred in the home market, which are incurred prior to the sale, transfer, or shipment of the merchandise to the U.S. affiliate, as an expense incurred on behalf of the sale to the U.S. affiliate." 62 Fed. Reg. at 2124. Commerce did not consider this to reflect a commercial activity in the United States and, therefore, it did not deduct domestic inventory carrying costs from CEP for the Final Results. See id.

NSK contends that Commerce included inventory carrying costs in the CEP offset when matching CEP sales to NV, but erroneously neglected to include such costs in the CEP offset when it matched CEP sales to CV. See NSK's Mem. at 29. Commerce agrees with NSK. See Def.'s Mem. at 25.

Torrington disagrees, contending that the "rationale for an

offsetting deduction has evaporated" because Commerce no longer deducts the costs at issue from the factory to the time of sale to the United States affiliate from the United States sale. Torrington Mem. at 32. NSK responds that in calculating the CEP offset, the statute compels Commerce to reduce NV "'by the amount of indirect selling expenses incurred in the country in which [NV] is determined on sales of the foreign like product,'" subject to the CEP offset. NSK's Reply Mem. at 3 (quoting 19 U.S.C. § 1677b(a)(7)(B)). Since the costs at issue constitute an indirect selling expense incurred in the home market on sales of the foreign like product, NSK asks the Court to disregard Torrington's argument as inconsistent with the statute. See id.

Title 19, United States Code, § 1677b(a)(1)(B) requires Commerce to establish NV to the extent practicable, at the same LOT as the EP or CEP. When Commerce is unable to match United States sales with foreign market sales at the same LOT, an adjustment to NV should be made to account for the differences in price that result from the differences in LOT. See 19 U.S.C. § 1677b(a)(7)(A). When the data available does not provide an appropriate basis to grant an LOT adjustment under § 1677b(a)(7)(A), but NV is established at an LOT constituting a more advanced stage of distribution than the LOT of the CEP, the statute ensures a fair comparison between United States price and NV by

reducing NV by what is known as the "CEP offset." See 19 U.S.C. § 1677b(a)(7)(B) (CEP offset is an adjustment that is made to NV when NV is being compared to CEP sales in the United States). Specifically, the CEP offset adjustment is made by reducing NV "by the amount of indirect selling expenses incurred in the country in which [NV] is determined on sales of the foreign like product," but this deduction may not exceed (i.e., it is "capped" by) the amount of the indirect selling expenses deducted in calculating CEP. Id. Since the inventory carrying costs at issue constitute an indirect selling expense incurred in the home market on the sales of the foreign like product, the Court remands to Commerce to include the imputed inventory carrying costs in the calculation of CEP offset for NSK when matching CEP sales to CV. See generally Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan, 63 Fed. Reg. 8909, 8915 (Feb. 23, 1998) (Commerce included inventory carrying costs in the CEP offset for CEP sales matched to price-based NVs and CV).

## IV. NSK's Affiliation With Its Supplier; Exhaustion of Administrative Remedies

NSK does not dispute that 19 U.S.C. § 1677(33) establishes a rebuttable presumption that NSK controls a supplier by virtue of the fact that NSK owns at least five percent of the supplier's equity. See NSK's Mem. at 33. NSK argues that it has rebutted the

statutory presumption by placing facts on the record showing that "NSK is not legally or operationally in a position to exercise restraint or discretion over" its supplier. Id. NSK requests that the Court remand the issue to Commerce and instruct it to consider the evidence of NSK's lack of control of its supplier in order to rebut the presumption of affiliation. See id.

Commerce argues that NSK failed to exhaust its administrative remedies. See Def.'s Mem. at 25. In its preliminary analysis memorandum, Commerce stated that for purposes of calculating CV, NSK had based its cost of manufacturing ("COM") on the transfer price of parts supplied by affiliates, but that Commerce adjusted COM so that it was based on the actual cost of the parts. See id. at 28. In its brief, NSK argued that the transfer prices fairly reflected market value, and that Commerce need not reject the transfer prices. See id. NSK also argued that its supplier was not in a position to provide favorable treatment to NSK, and contended that the supplier dealt with NSK at arm's length. See id. at 29. Despite its acknowledgment that NSK raised the supposed "affiliation" between it and its supplier in its case brief, Commerce maintains that NSK failed to raise the issue during the administrative process. See id. Torrington argues that Commerce reasonably determined that the transfer prices of NSK's supplier were not at arm's length. See Torrington's Resp. at 33-36.

It is a cardinal principle of administrative law that a court may not consider a party's arguments that were not made before the agency. See United States v. L.A. Tucker Truck Line, Inc., 344 U.S. 33, 36-37 (1952) ("We have recognized ... that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."); Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action."). In this case, however, there is no absolute requirement of exhaustion in the Court of International Trade. See Alhambra Foundry Co. v. United States, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 of the United States Code directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. See Cemex, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998). "[E]ach exercise of

judicial discretion in not requiring litigants to exhaust administrative remedies" has been characterized as "'an exception to the doctrine of exhaustion.'" Alhambra Foundry, 12 CIT at 347, 685 F. Supp. at 1256 (citing Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986)).

Here, NSK has exhausted its administrative remedies. As Commerce acknowledges, NSK brought forth the issue of affiliation in its case brief following Commerce's preliminary analysis memorandum. See Def.'s Mem. at 28. Relying upon its argument that NSK failed to exhaust its administrative remedies, Commerce did not address the merits of the issue in its brief to the Court. Accordingly, the Court remands this issue to Commerce for reconsideration.

**V.   Commerce's Inclusion of NTN's Home-Market Alleged Sample Sales and Sales with High Profit Levels in the Home-Market Database; Commerce's Inclusion of a Particular Ball Bearing Model in Koyo's Home-Market Database and its Finding Regarding Foreign Like Product**

**A.   Background**

Commerce is required to base its NV calculation upon "the price at which the foreign like product is first sold . . . in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). Analogously, CV must be calculated using "amounts incurred . . . for profits, in connection with the production and sale of a

foreign like product, in the ordinary course of trade, for consumption in the foreign country . . . ." 19 U.S.C. § 1677b(e)(2)(A). NTN contended during the review that Commerce, in calculating NV, should have excluded sample sales and sales with high profit levels because they were outside of the ordinary course of trade. See Final Results, 62 Fed. Reg. at 2123. Commerce rejected NTN's contention, explaining as follows:

> We have determined that NTN's characterization of its reported data is not substantiated by the administrative record. NTN's sales information merely identifies certain sales as home[-]market sample sales and other sales with "abnormally high profits" as not in the ordinary course of trade. NTN examined only quantity and frequency of sales in determining which sales to report as outside the ordinary course of trade. NTN's supplemental questionnaire response provided no additional information; it simply identified the sales as having been made outside the ordinary course of trade. . . . [T]he fact that a respondent identified sales as sample and prototype sales does not necessarily render such sales outside the ordinary course of trade. . . . Verification of the designation of certain sales as samples merely proves that the respondent identified sales recorded as samples in its own records. Such evidence does not indicate that such sales were made outside the ordinary course of trade for purposes of calculating NV in these reviews. In addition, [Commerce] noted at the home[-]market verification of NTN's data that the firm was unable to substantiate that all sales coded as samples were sample sales.

Id. at 2123-24.

Koyo alleged that Commerce matched United States sales of one particular model to a home-market model which it sold out of the ordinary course of trade and which does not qualify as a foreign

like product as defined by the antidumping statute.  See id. at

2124.  Koyo contended that the home-market model: (1) is produced

to unusual product specifications; (2) was sold at aberrational

prices; and (3) is not a foreign like product because it is "not

identical in physical characteristics and is not like the United

States model being compared to it because of a different end-use."

Id.

Commerce rejected Koyo's contentions, stating the following:

> In spite of Koyo's arguments, this model and the
> respective bearing family meet the matching criteria as
> outlined in [Commere's] questionnaire.  Also, the
> difference-of-merchandise adjustment for the family to
> which we matched the U.S. model does not exceed plus or
> minus 20 percent of the U.S. model's COM. . . . Koyo has
> not demonstrated how the model's costs can meet our 20-
> percent test yet be so dissimilar.  Moreover, sales of
> models at high prices is insufficient to establish a sale
> outside the ordinary course of trade.

Id.

### B.    Contentions of the Parties

NTN argues that Commerce's failure to exclude NTN's sales with

unusually high profit levels from the NV and CV calculations,

despite NTN providing sufficient evidence on record indicating that

these sales were outside of the ordinary course of trade, was

inconsistent with 19 U.S.C. § 1677b(a)(1)(B), the SAA and the

regulation 19 C.F.R. § 351.102(b), all of which clearly instruct

Commerce to make such an exclusion.  See NTN's Mem. Supp. Mot. J.

Agency R. ("NTN's Mem.") at 8-9.  NTN also argues that Commerce

erred in including its home-market sample sales in the calculation

of NV because facts on the record support that the sales were made

outside of the ordinary course of trade.  See id. at 10-11.  NTN,

therefore, requests that its sales with high profit levels and

samples sales be disregarded in the calculation of NV.  See id.

Koyo argues that Commerce should have excluded sales of a

particular ball bearing model, "Model X," from the database and

margin calculation because the transactions in which Model X was

sold were outside the ordinary course of trade as defined by the

antidumping statute and the SAA.  See Koyo's Mem. P. & A. Supp.

Mot. J. Agency R. at 23-24.  Koyo contends that in determining

whether transactions are outside the ordinary course of trade,

Commerce should have considered factors other than price at which

the merchandise was sold, such as the fact that Model X is produced

according to unusual product specifications.  See id. at 25.

Koyo also maintains that even if sales of Model X are not

outside the ordinary course of trade, there is no basis for

concluding that these sales provide an acceptable match to United

States sales.  See id. at 29.  Koyo asserts that Model X falls

within none of the categories of a "foreign like product" and

should have not been matched to United States sales.  See id. at

30.  Koyo again criticizes Commerce's reliance upon the single

factor of cost in making its determination.  See id.

Commerce alleges that it properly exercised its discretion in rejecting NTN's argument that Commerce must disregard sales with high profit levels as sales not in the ordinary course of trade because "NTN provided no information, other than numerical profit amounts, to support its claim," and a "mere claim that certain sales were 'sales with abnormally high profits' does not constitute sufficient evidence to exclude them upon the basis that they are outside of the ordinary course of trade."  Def.'s Mem. at 47. Commerce further asserts that the Court should reject NTN's request to exclude samples for which it received no consideration on the basis that the sales were outside the ordinary course of trade because NTN failed to provide sufficient evidence to support its claim.  See id. at 49-50.  Although NTN cites NSK for the proposition that "sample sales are commonly considered to be outside the ordinary course of trade," Commerce contends that NSK is not applicable because that case did not address NTN's claim regarding sample sales that are outside the ordinary course of trade, but rather addressed sample sales that are unsupported by consideration.  See id. at 52.

Commerce also contends that it properly rejected Koyo's arguments.  Commerce argues that by referencing Final Results of Antidumping Administrative Reviews; Tapered Roller Bearings and

Parts Thereof, Finished and Unfinished, From Japan and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan, 58 Fed. Reg. 64,720 (Dec. 9, 1993), it explained that it based its determination on the standard set forth in that review, namely, that Commerce accounts for all the circumstances particular to the relevant sales rather than one factor in isolation. See Def.'s Mem. at 38. Commerce rejects Koyo's contention that the use of certain materials to make the model as well as the use to which Model X is put render the bearing unusual because Koyo failed to show that Model X does not meet Commerce's model match criteria for ball bearings or that Model X is not used as a ball bearing. See id. at 39. Commerce also rejects Koyo's characterization of its sales as aberrant based on their price because high price alone is not sufficient to exclude sales that would otherwise be within the ordinary course of trade. See id. at 40.

Commerce further contends that it properly determined that Model X was a foreign like product because the statute requires that "if foreign market sales of 'similar' merchandise are not available for comparison, Commerce must select foreign market sales of merchandise of the same general class or kind as the merchandise being compared." Id. at 41. Commerce argues that it was granted broad discretion in determining what constitutes similar

merchandise for purposes of comparison and exercised this discretion in two ways. See id. First, Commerce developed a model-matching criteria for the purpose of identifying similar merchandise where there were sales of identical merchandise in the foreign market, and it used sales of the most similar bearing family when identical matches could not be found. See id. at 42. Second, Commerce applied the 20 percent difmer test to identify the most similar merchandise. See id. The difmer test required Commerce to consider whether "the difference between the variable costs of manufacturing of the U.S. and foreign market merchandise is greater than 20 percent of the variable cost of the U.S. merchandise," and to disregard sales of foreign market merchandise failing this test. Id. at 42-43. Commerce "relies upon variable costs of manufacturing to indicate the impact of physical differences on the costs," and Commerce assumes "that the fixed costs of manufacturing the United States merchandise and the foreign market merchandise are not affected by the physical differences of the merchandise and that the additional variable costs that are incurred due to physical differences are fully reflected in the price of the merchandise." Id. at 44.

Commerce argues that the model-matching criteria it used, and that Koyo criticizes, properly account for physical characteristics such as bearing types and precision grades and, when identical

matches do not exist, Commerce matches the United States sales to a bearing model family.  See id. at 45.  Commerce maintains that even when costs are similar, it will consider bearing models to be comparable only if they meet the matching criteria.  See id. at 46. Here, Commerce claims that it knew that the ball bearing model was comparable since "it shared the same eight pertinent characteristics as the U.S. bearing and all the other bearings within the family."  Id. at 45-46.

Torrington claims that Commerce properly rejected NTN's request to exclude high profit levels sales from the NV and CV calculation and sample sales from the NV calculation because: 1) a higher profit on a particular sale does not establish that a sale is outside the ordinary course of trade, and (2) NTN failed to show that the contested sales were not in the ordinary course of trade. See Torrington's Resp. at 37-39.

Torrington also claims that Koyo failed to carry the burden of establishing that the sales at issue were outside the ordinary course of trade.  See id. at 12.  Torrington maintains that "the product matched the criteria in Commerce's questionnaire and was reported as a foreign like product by Koyo."  Id. at 13.

### C.   Analysis

The term "ordinary course of trade" is defined as:

the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. [Commerce] shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:
> (A)   Sales disregarded under section 1677b(b)(1) of this title.
> (B)   Transactions disregarded under section 1677b(f)(2) of this title.

19 U.S.C. § 1677(15) (emphasis supplied).  Section 1677b(b)(1)

deals with below-cost sales.  Section 1677b(f)(2) deals with sales

to affiliated persons.  Therefore, Commerce must consider below-

cost sales and sales between related parties as sales outside the

ordinary course of trade.  Although § 1677b(b)(1)'s below-cost

sales and § 1677b(f)(2)'s affiliated-party transactions are

specifically designated as outside the ordinary course of trade,

the "among others" language of § 1677(15) clearly indicates that

other types of sales could be excluded as being outside the

ordinary course of trade.[2]  Commerce "may consider sales or

---

[2]   The SAA accompanying the URAA provides that aside from §§ 1677b(b)(1), (f)(2) transactions:

> Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market. Examples of such sales or transactions include merchandise produced according to unusual product specifications, merchandise sold at aberrational prices, or merchandise sold pursuant to unusual terms of sale. As under existing law, amended section 771(15) does not establish an exhaustive list, but the Administration intends that Commerce will interpret section 771(15) in a manner which

transactions to be outside the ordinary course of trade if [Commerce] determines, based on an <u>evaluation of all of the circumstances</u> particular to the sales in question, that such sales or transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. § 351.102(b) (emphasis supplied). Examples that could be considered outside the ordinary course of trade include: (1) off-quality merchandise; (2) merchandise produced according to unusual product specifications; (3) merchandise sold at aberrational prices or with abnormally high profits; (4) merchandise sold pursuant to unusual terms of sale; or (5) merchandise sold to an affiliated party not at an arm's-length transaction. <u>See</u> 19 C.F.R. § 351.102(b).

Determining whether a sale or transaction is outside the ordinary course of trade is a question of fact. In making this determination, Commerce considers not just "one factor taken in isolation but rather . . . all the circumstances particular to the sales in question." <u>Murata Mfg. Co., Ltd. v. United States</u>, 17 CIT

---

will avoid basing normal value on sales which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results.

H.R. DOC. No. 103-316, vol. 1, at 834 (emphasis supplied). The SAA also provides that "[o]ther examples of sales that Commerce could consider to be outside the ordinary course of trade include sales of off-quality merchandise, sales to related parties at non-arm's-length prices, and sales with abnormally high profits." <u>Id.</u> at 839-40.

259, 264, 820 F. Supp. 603, 607 (1993) (citation omitted). Commerce's methodology for making this determination is codified in section 351.102(b) of Commerce's regulations. See 19 C.F.R. § 351.102(b); see also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Review, 64 Fed. Reg. 35,590, 35,620 (July 1, 1999). Thus, Commerce has the discretion to interpret § 1677(15) to determine which sales are outside the ordinary course of trade, such as sales involving aberrational prices and abnormally high profit levels.

Section 351.102(b) of Title 19 of the Code of Federal Regulations effectively interprets the statutory phrase "outside the ordinary course of trade." 19 U.S.C. § 1677(15). In resolving questions of statutory interpretation, the Chevron test requires this Court first to determine whether the statute is clear on its face. If the language of the statute is clear, then this Court must defer to Congressional intent. See Chevron, 467 U.S. at 842-43. If the statute is unclear, however, then the question for the Court is whether the agency's answer is based on a permissible construction of the statute. See id. at 843; see also Corning Glass Works v. United States Int'l Trade Comm'n, 799 F.2d 1559, 1565 (Fed. Cir. 1986) (finding the agency's definitions must be

"reasonable in light of the language, policies and legislative history of the statute").

Here, the statutory provision defining what is considered outside the ordinary course of trade is unclear. While the statute specifically defines "ordinary course of trade," it provides little assistance in determining what is outside the scope of that definition. The statute merely identifies a non-exhaustive list of situations in which sales or transactions are to be considered outside the "ordinary course of trade." This Court finds the statute is ambiguous as to what constitutes a sale outside the ordinary course of trade. What Congress intended to exclude from the "ordinary course of trade" is also not immediately clear from the statute's legislative history. In the SAA, Congress stated that in addition to the specific types of transactions to be considered outside the ordinary course of trade, "Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market." H.R. DOC. No. 103-826, vol. 1, at 834. Congress also stated that as the statute does not provide an exhaustive list of situations which qualify as being outside the ordinary course of trade, "the Administration intends that Commerce will interpret section 771(15) [19 U.S.C. § 1677(15)] in a manner which will avoid basing normal value on sales which are

Consol. Court No. 97-02-00216                                      Page 37

extraordinary for the market in question." Id. This Court finds

the legislative history is also ambiguous as to what constitutes a

sale outside the ordinary course of trade.

Because neither the statutory language nor the legislative

history explicitly establishes what is considered to be outside the

"ordinary course of trade," the Court assesses the agency's

interpretation of the provision to determine whether the agency's

interpretation is reasonable and in accordance with the legislative

purpose. See Chevron, 467 U.S. at 843. In determining whether

Commerce's interpretation is reasonable, the Court considers, among

other factors, the express terms of the provisions at issue, the

objectives of those provisions, and the objective of the

antidumping scheme as a whole. The purpose of the ordinary course

of trade provision is "to prevent dumping margins from being based

on sales which are not representative" of the home market. See

Monsanto Co. v. United States, 12 CIT 937, 940, 698 F. Supp. 275,

278 (1988). Commerce's methodology for deciding when sales are

outside the "ordinary course of trade" has been to examine the

totality of the circumstances surrounding the sale or transaction

in question to determine whether the sale or transaction is

extraordinary. Commerce's regulation specifically states, "sales

or transactions [may be considered] outside the ordinary course of

trade if [,] . . . based on an evaluation of all of the

circumstances particular to the sales in question, [] such sales or

transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. § 351.102(b). Commerce's methodology allows it, on a case-by-case basis, to examine all conditions and practices which may be considered ordinary in the trade under consideration and to determine which sales or transactions are, therefore, outside the ordinary course of trade. Because such a methodology gives Commerce wide discretion in deciding under what circumstances sales or transactions are outside the ordinary course of trade and circumstances differ in each case, this Court finds that, in light of the statute's legislative purpose, Commerce's interpretation of the statute and exercise of its discretion by requiring additional evidence demonstrating that sales with high profit levels were outside of the ordinary course of trade before excluding such sales from the NV and CV calculations was reasonable.

NTN provided Commerce with insufficient evidence to show that Commerce should have excluded sales with abnormally high profits. The mere fact of abnormally high profits is not enough to put these sales outside of the ordinary course of trade. The presence of profits higher than those of other sales is merely an element for Commerce to take into consideration and does not necessarily place the sales outside of the ordinary course of trade; nor does it strip Commerce of the right to exercise its discretion and conclude that sales with abnormally high profits lack the characteristics

necessary to place them outside the ordinary course of trade.

Consequently, because Commerce's interpretation and application of the statute was reasonable and the record reflects that NTN did not provide sufficient additional evidence that supports its claim that the disputed sales were extraordinary for the market in question, Commerce was justified in its decision to include NTN's sales with unusually high profit levels in the NV and CV calculations. The Court also finds that Commerce rightfully included NTN's home-market "sample" sales in the NV calculation because NTN failed to provide sufficient additional evidence that those sales were outside the ordinary course of trade.[3]

By contrast, Commerce's determinations with respect to Koyo must be reconsidered. Koyo provided evidence in support of its contention that Model X was outside the ordinary course of trade in addition to evidence that sales of Model X were at aberrational prices. In addition to evidence of price, Koyo presented evidence of quantity, product specifications requiring special materials,

---

[3] NTN points out that its sample sales were (a) made for customer evaluation and not for consumption purposes and (b) marked with letters "SS" in NTN's accounting and record keeping systems. NTN's Mem. at 11. The Court is unconvinced. NTN provided Commerce with no record showing that NTN's customers were precluded from consumption of NTN's samples and the peculiarity of NTN's designation of such sales in its accounting and record-keeping systems does not strip Commerce of the right to exercise its discretion and conclude that these sales lacked the characteristics necessary to place them outside the ordinary course of trade.

standards and processes required to produce the model, particular use of the model, and packaging requirements. There is no indication that Commerce even considered these factors; in the Final Results, Commerce simply stated that "Koyo has not demonstrated how the model's costs can meet our 20-percent test yet be so dissimilar" and that "sales of models at high prices [are] insufficient to establish a sale outside the ordinary course of trade." 62 Fed. Reg. at 2124. The Court, therefore, remands this issue to Commerce, instructing it to reconsider its determination that Model X was outside the ordinary course of trade and to articulate a clear basis for any conclusion it reaches.

The Court also remands Commerce's determination that Koyo's home-market ball bearing could be compared to United States sales because it is a foreign like product. Koyo does not contend that Model X failed the model match methodology and the difmer test. Commerce applied them here and found the merchandise comparable; however, Commerce did not indicate whether it made its determination under § 1677(16)(B) or (C). Accordingly, the Court remands this issue to Commerce. Commerce is directed to articulate the basis for its determination and demonstrate how each element of the applicable subsection is satisfied.

**VI. Commerce's Determination of the Level of Trade for NTN and Denial of a Level of Trade Adjustment for NTN and NSK[4]**

**A.    Background**

**1.    Statutory Provisions**

Under pre-URAA antidumping law, there were no specific provisions providing for an adjustment to foreign market value ("FMV") for any difference in LOT between United States price (now EP or CEP) and FMV.  Commerce, however, promulgated a regulation stating that: (1) it normally would calculate FMV and United States price based on sales at the same commercial LOT; and (2) if such sales were insufficient to permit an adequate comparison, Commerce would calculate FMV based on such or similar sales at the most comparable LOT in the United States market, making appropriate adjustments for differences affecting price comparability.  See 19 C.F.R. § 353.58 (1994); see generally NEC Home Elecs., Ltd., 54 F.3d at 739 (discussing 19 C.F.R. § 353.58).

The URAA amended the antidumping statute to provide for a specific provision regarding adjustments to NV for differences in LOTs.  Instead of FMV, see 19 U.S.C. § 1677b (1988), the statute now provides for NV, see URAA § 233(a)(1), 108 Stat. at 4898

---

[4] In its motion for judgment on the agency record, Koyo argued that Commerce acted unlawfully in failing to grant it an LOT adjustment.  Koyo later abandoned its claim.  See Koyo's Reply Br. to Def. and Def.-Intervenor's Resps. to Koyo's Mot. J. Agency R. at 2.  In light of Koyo's abandonment of its claim, the Court will not address Koyo's arguments regarding the LOT adjustment.

(replacing the term FMV with NV), which shall be based on:

> the price at which the foreign like product is first sold
> (or, in the absence of a sale, offered for sale) for
> consumption in the exporting country, in the usual
> commercial quantities and in the ordinary course of trade
> and, <u>to the extent practicable, at the same level of
> trade as the export price or constructed export price</u>.

19 U.S.C. § 1677b(a)(1)(B)(i) (emphasis added).  The statute also
provides for an LOT adjustment to NV under the following
conditions:

> The price described in [§ 1677b(a)(1)(B), <u>i.e.</u>, NV,]
> shall also be increased or decreased to make due
> allowance for any difference (or lack thereof) between
> the export price or constructed export price and the
> price described in [§ 1677b(a)(1)(B)] (other than a
> difference for which allowance is otherwise made under [§
> 1677b(a)]) that is shown to be wholly or partly due to a
> difference in level of trade between the export price or
> constructed export price and normal value, if the
> difference in level of trade--
> > (i) involves the performance of different
> selling activities; and
> > (ii) is demonstrated to affect price compara-
> bility, based on a pattern of consistent price
> differences between sales at different levels of
> trade in the country in which normal value is
> determined.
> In a case described in the preceding sentence, the amount
> of the adjustment shall be based on the price differences
> between the two levels of trade in the country in which
> normal value is determined.

19 U.S.C. § 1677b(a)(7)(A).  In sum, to qualify for an LOT
adjustment to NV, a party has the burden to show that the following
two conditions have been satisfied: (1) the difference in LOT
involves the performance of different selling activities; and (2)
the difference affects price comparability.  <u>See</u> SAA at 829
(stating that "if a respondent claims [an LOT] adjustment to

decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment"); see also NSK Ltd. v. United States, 190 F.3d 1321, 1330 (Fed. Cir. 1999) (noting that a respondent bears the burden of establishing entitlement to an LOT adjustment).

When the available data does not provide an appropriate basis to grant an LOT adjustment, but NV is established at an LOT constituting a more advanced stage of distribution than the LOT of the CEP, the statute ensures a fair comparison by providing for an additional adjustment to NV known as the "CEP offset." See 19 U.S.C. § 1677b(a)(7)(B). Specifically, the CEP offset provides that NV "shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made [from CEP] under [19 U.S.C. § 1677a(d)(1)(D)]." 19 U.S.C. § 1677b(a)(7)(B).

### 2.   Commerce's LOT Methodology

During this review, Commerce applied the following LOT methodology. See Final Results, 62 Fed. Reg. at 2105; Preliminary Results, 61 Fed. Reg. at 35,718. In accordance with §

1677b(a)(1)(B)(i), Commerce first calculates NV based on exporting-country (or third-country) sales, to the extent practicable, at the same LOT as the United States (EP and CEP) sales. See Final Results, 62 Fed. Reg. at 2105. When Commerce is unable to find comparison sales at the same LOT as the EP or CEP sales, it compares such United States sales to sales at a different LOT in the comparison (home or third-country) market. See id.

With respect to the LOT methodology for CEP sales, Commerce first calculates CEP by making adjustments to its starting price under 19 U.S.C. § 1677a(d) (1994), but before making any adjustments under § 1677a(c). See id. Commerce reasoned that the § 1677a(d) "adjustments are necessary in order to arrive at, as the term CEP makes clear, a 'constructed' export price," that is, it is intended to reflect as closely as possible a price corresponding to an EP between non-affiliated exporters and importers. Id. at 2107. Once the starting price is adjusted under § 1677a(d), Commerce has a "hypothetical transaction price that would likely have been charged to the first purchaser in the United States had that purchaser been unaffiliated to the exporter." Def.'s Mem. at 49-50.

The next step in its LOT analysis is to determine whether sales in the home market exist that are at the same LOT as the adjusted CEP sales. In making such a determination, Commerce

examines whether the home-market sales are "at different stages in the marketing process than the export price or CEP," that is, Commerce reviews and compares the distribution systems in the home market and U.S. export markets, "including selling functions, class of customer, and the level of selling expenses for each type of sale." Final Results, 62 Fed. Reg. at 2105.

If the adjusted CEP sales and the NV sales are at a different LOT, Commerce then considers whether an LOT adjustment is appropriate. In determining the propriety of an adjustment to NV, Commerce determines whether two conditions specified in § 1677b(a)(7)(A) are satisfied: (1) "there must be differences between the actual selling activities performed by the exporter at the level of trade of the U.S. sale and the level of trade of the comparison market sales used to determine NV"; and (2) "the differences must affect price comparability as evidenced by a pattern of consistent price differences between sales at the different levels of trade in the market in which NV is determined." Preliminary Results, 61 Fed. Reg. at 35,718. If there is no pattern of consistent price differences, no adjustment is made. Finally, for CEP sales, if NV is established at an LOT which constitutes a more advanced stage of distribution than the CEP LOT, and if there is no appropriate basis for granting an LOT adjustment, Commerce makes a CEP offset to NV under § 1677b(a)(7)(B). See id.

**B.    NSK's Issues**

**1.    NSK Failed to Exhaust Its Administrative Remedies**

Commerce maintains that NSK failed to raise the issue of Commerce's failure to grant a partial LOT adjustment for NSK's home-market level 2 sales.  See Def.'s Mem. at 74-75.  Commerce contends that NSK had ample opportunity to raise this issue, and it would be unjust to require Commerce to waste public resources in addressing it.  See id. at 76.

NSK maintains that it raised the issue of the LOT adjustment in its General Issues Case Brief, its original response to Commerce and at the Commerce General Issues hearing.  See NSK's Reply at 14. NSK maintains that although it may not have clearly expressed its argument in those submissions, it clearly raised the issue of appropriate LOT matches and adjustments before Commerce and that the issue is ripe for review by the Court.  See id. at 15.

Commerce is not contending that NSK altogether failed to raise the issue of the LOT adjustment; rather, Commerce takes issue with NSK's failure to raise the particular matter of a partial, price-based LOT adjustment.  Regardless of whether NSK failed to properly raise the issue during the administrative process, the Court exercises its discretion to rule on the issue since it has been resolved in prior decisions.

> ### 2.   Commerce Properly Denied a Partial, Price-based LOT Adjustment to NV for NSK's CEP sales

NSK agrees that Commerce properly used the CEP as adjusted for § 1677a(d) expenses prior to its LOT analysis.  NSK also argues that Commerce should have granted it a "partial," price-based LOT adjustment.  See NSK's Mem. at 27.

NSK first notes that Commerce found two LOTs in the home market, one corresponding to original equipment manufacturers ("OEM") sales and the other to after market ("AM") sales.  See id. at 23.  NSK also agrees that when Commerce matched CEP sales to some home-market sales, Commerce correctly applied a CEP offset because there was no basis for quantifying a price-based LOT adjustment for CEP to certain NV matches.  See id.  Further, NSK notes that Commerce correctly concluded "that there is no record information that would allow Commerce to quantify the downward price adjustment to adjust fully [one home-market LOT] to the CEP [LOT]."  Id. at 26.  Nevertheless, NSK disagrees with Commerce's decision to apply a CEP offset when Commerce matched CEP sales to other home-market sales.  In these situations, NSK argues that § 1677b(a)(7)(A) and the SAA direct Commerce to calculate a partial, price-based LOT adjustment to NV for CEP sales measured by the price differences between the home-market LOTs.  See id. at 26.

NSK notes that the statute directs Commerce to adjust NV for any difference between CEP and NV "'wholly or partly'" due to a difference in LOT between CEP and NV. Id. (quoting § 1677b(a)(7)(A)). NSK also notes that § 1677b(a)(7)(B) indicates a CEP offset should only be used in the total absence of price-based LOT adjustments. See id. Accordingly, NSK claims that Commerce's failure to calculate a price-based LOT adjustment that partly accounted for such LOT differences violated the plain language of § 1677b(a)(7)(A). See id. at 27.

Commerce argues that it properly denied a partial LOT adjustment and applied a CEP offset to NV for all of NSK's CEP transactions. See Def.'s Mem. at 76. Contrary to NSK's reading of § 1677b(a)(7)(A), Commerce asserts that the statute does not provide for LOT adjustments "other than those based upon price differences in the home market between the [LOT] of the CEP and the [LOT] of the NV." Id. at 80. Commerce asserts that the statute's use of the term "partly" refers to the situation "where there is a home[-]market pattern of price differences between the [LOT] of the CEP and the [LOT] of the NV, Commerce shall adjust only for that portion of the price difference which is associated with the difference in level of trade." Id. (emphasis in original). Commerce maintains that "there is no indication that the pattern of price differences between two levels of trade in the home market, absent a CEP level of trade in the home market, can justify a level

of trade adjustment--be it 'whole' or 'partial.'" Id. Commerce, therefore, asserts that since it reasonably interpreted § 1677b(a)(7)(A), the Court should sustain its denial of an LOT adjustment and grant of a CEP offset for all of NSK's CEP transactions. See Def.'s Mem. at 82.

Torrington generally agrees with Commerce's positions, emphasizing that Commerce reasonably interpreted § 1677b(a)(7)(A) as not providing for a "partial" LOT adjustment as contended by NSK. See Torrington's Resp. at 28. Torrington further argues that even if § 1677b(a)(7)(A) permits a partial LOT adjustment, NSK nevertheless failed to submit record evidence to show entitlement to such an adjustment. See id.

The Court has already resolved this issue in NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 127-31. As this Court decided in NTN Bearing, Commerce's decision to deny NSK a partial, price-based LOT adjustment measured by price difference between home-market OEM and AM sales was in accordance with law. There is no indication in § 1677b(a)(7)(A) that the pattern of price differences between two LOTs in the home market, absent a CEP LOT in the home market, justifies an LOT adjustment. Rather, Commerce's interpretation of § 1677b(a)(7)(A) as only providing an LOT adjustment based upon price differences in the home market between the CEP LOT and the NV LOT was reasonable, especially in light of the existence of the CEP

offset to cover situations such as those at issue here.

###    C.    NTN's Issues

####        1.    Contentions of the Parties

NTN contends that Commerce improperly denied a price-based LOT adjustment under § 1677b(a)(7)(A) for CEP sales made in the United States market at an LOT different from the home-market sales.  <u>See</u> NTN's Mem. at 11.  In particular, NTN argues, <u>inter alia</u>, that Commerce incorrectly determined NTN's CEP LOT because the agency failed to use the sale to the first unaffiliated purchaser in the United States to determine NTN's CEP LOT.  <u>See id.</u> at 13.  NTN requests that the Court remand the LOT issue to Commerce to determine NTN's CEP LOTs prior to any § 1677a(d) deductions and, afterwards, to grant NTN a price-based LOT adjustment for its CEP sales.  <u>See id.</u> at 13.

Commerce, in turn, argues that it properly determined the LOT for NTN's CEP sales after deducting expenses and profit from the price to the first unaffiliated purchaser in the United States pursuant to § 1677a(d) because § 1677b(a)(7)(A), which provides for an LOT adjustment, requires Commerce to compare CEP, not the "unadjusted" starting price of CEP, with NV.  <u>See</u> Def.'s Mem. at 52-70.  Commerce notes CEP is defined in § 1677a(b) as the price at which the subject merchandise is first sold (or agreed to be sold)

in the United States as "adjusted" under § 1677a(d). See id. at 56. According to Commerce, the adjusted CEP price is to be compared to prices in the home market based on the same LOT whenever it is practicable; when it is not practicable and the LOT difference affects price comparability, Commerce makes an LOT adjustment. See id. at 59-60. Commerce makes a CEP offset when "Commerce is not able to quantify price differences between the CEP level of trade and the level of trade of the comparison sales, and if NV is established at a more advanced state of distribution than the CEP level of trade." Id. at 60. If the CEP price is not adjusted before it is compared under the approach advocated by NTN, "there will always be substantial deductions from the resale prices in the United States (because they are mandatory)," but they "will be compared to resale prices in the home market from which virtually [there will] never be any equivalent deductions," thus creating a substantial imbalance and a skewed comparison between NV and CEP. Id. at 64 (emphasis in the original).

Commerce claims that it properly denied an LOT adjustment for NTN's CEP sales because NTN failed to establish its entitlement to an LOT adjustment. Commerce was unable to calculate an LOT adjustment because "NTN did not have a level of trade equivalent to the CEP level of trade in the home market," making it impossible to quantify the difference in price between the CEP LOT and the home-market LOT. Id. at 86. Commerce maintains that the Court should

uphold its refusal to grant to NTN an LOT adjustment.  See id.

Torrington generally agrees with Commerce's positions, emphasizing that: (1) Commerce correctly made § 1677a(d) adjustments to the starting price of CEP prior to determining an LOT for NTN's CEP sales; and (2) properly denied an LOT adjustment for NTN's CEP sales.  See Torrington's Resp. at 39-48. Accordingly, Torrington contends that this Court should not disturb Commerce's reasonable interpretation of the statute as applied to the record evidence.  See id.

### 2. Analysis

In Micron Tech., Inc. v. United States, 243 F.3d 1301 (Fed. Cir. 2001), the Court of Appeals for the Federal Circuit ("CAFC") held that the plain text of the antidumping statute and the SAA require Commerce to deduct the expenses enumerated under § 1677a(d) before making the LOT comparison.[5]  The CAFC examined §1677b(a)(1)(B)(i), which provides that Commerce must establish NV "to the extent practicable, at the same level of trade as the export price or [CEP]," and § 1677a(b), which defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States . . . as adjusted under subsections

---

[5] The CAFC's decision reversed the Court of International Trade's determination in Borden, Inc. v. United States, 22 CIT ___, 4 F. Supp. 2d 1221 (1998), a case discussed by the parties in the instant matter.

(c) and (d) of this section." (Emphasis supplied). The CAFC concluded that "[r]ead together, these two provisions show that Commerce is required to deduct the subsection (d) expenses from the starting price in the United States before making the level of trade comparison." Micron Tech., Inc., 243 F.3d at 1315. The court further stated that this conclusion is mandated by the SAA, which states that "'to the extent practicable, [Commerce should] establish [NV] based on home[-]market (or third[-]country) sales at the same level of trade as the constructed export price or the starting price for the export price.'" Id. (citing SAA at 829).

Thus, the Court finds that Commerce properly made § 1677a(d) adjustments to NTN's starting price in order to arrive at CEP and make its LOT determination. The Court also finds that Commerce's decision to deny NTN an LOT adjustment is supported by substantial evidence. Section 1677b(a)(7)(A) permits Commerce to make an LOT adjustment "if the difference in level of trade . . . involves the performance of different selling activities[] and . . . is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined." With respect to CEP sales, Commerce found that the same LOT as that of the CEP for merchandise under review did not exist for any respondent in the home market; therefore, Commerce was unable to "determine whether there was a pattern of consistent price

differences between the [LOTs] based on respondent's [home-market]
sales of merchandise under review."  See Final Results, 62 Fed.
Reg. at 2106.

Commerce looked to alternative methods for calculating LOT
adjustments in accordance with the SAA.  See id.  In particular,
Commerce noted that the SAA states:

> "if information on the same product and company is not
> available, the [LOT] adjustment may also be based on
> sales of other products by the same company.  In the
> absence of any sales, including those in recent time
> periods, to different levels of trade by the exporter or
> producer under investigation, Commerce may further
> consider the selling expenses of other producers in the
> foreign market for the same product or other products."

Id. (quoting SAA at 830).  Commerce did not have the information
that would have supported the use of these alternative methods. See
id.  Consequently, with respect to CEP sales which Commerce was
unable to quantify an LOT adjustment, it granted a CEP offset to
respondents, including NTN, where the home-market sales were at a
more advanced LOT than the sales to the United States, in
accordance with 19 U.S.C. § 1677b(a)(7)(B).  See id.  In sum,
Commerce acted well within the directive of the statute in denying
the LOT adjustment and granting a CEP offset instead.  See 19
U.S.C. § 1677b(a)(7).

**VII. Commerce's Recalculation of NTN's Home-Market and United
     States Indirect Selling Expenses Without Regard to Level of
     Trade**

A.    Background

In its preliminary calculations, Commerce had calculated NTN's United States indirect selling expenses without regard to LOTs. See Final Results, 62 Fed. Reg. at 2105.  NTN argued that Commerce should have recalculated NTN's United States selling expenses to reflect its reported indirect selling expense allocations based on LOT.  See id.  Torrington, in turn, contended that Commerce should reject NTN's indirect selling expense allocations based on LOT because they bear no relationship to the way in which NTN incurs the expenses.  See id.

Commerce responded that in three prior reviews it determined that NTN's methodology for allocating its indirect selling expenses based on LOTs did not bear any relationship to the manner in which NTN incurred these United States selling expenses and its methodology led to distorted allocations.  See id.  Commerce noted that the court upheld its methodology in NTN Bearing Corp. of Am. v. United States ("NTN"), 19 CIT 1221, 1233-34, 905 F. Supp. 1083, 1094-95 (1995).  See id.  Commerce "found that the allocations NTN calculated according to levels of trade were misplaced and that it could not conclusively demonstrate that its [indirect selling expenses] vary across levels of trade."  Id.  Because Commerce found during this POR that NTN "did not provide sufficient evidence demonstrating that its selling expenses are attributable to levels

of trade," the agency recalculated NTN's United States indirect
selling expenses to represent such selling expenses for all United
States sales.  Id.


B.    **Contentions of the Parties**

NTN contends that Commerce's decision to reallocate NTN's
indirect selling expenses violates its mandate to administer the
antidumping laws. See NTN's Reply at 14.  NTN notes that Commerce
has accepted NTN's methodology of allocating its United States
indirect selling expenses based on LOT in previous reviews and even
stated that NTN's "'methodology prevents, rather than creates,
certain distortions.'" Id. at 13 (quoting Tapered Roller Bearings
and Parts Thereof, Finished and Unfinished, From Japan and Tapered
Roller Bearings, Four Inches or Less in Outside Diameter, and
Components Thereof, From Japan; Final Results of Antidumping Duty
Administrative Reviews and Revocation in Part of an Antidumping
Finding, 61 Fed. Reg. 57,629, 57,636 (Nov. 7, 1996)).  Accordingly,
NTN requests that the Court remand the matter to Commerce and
instruct it to recalculate NTN's margins by using NTN's reported
indirect selling expense LOT allocations.  See id. at 14.

Commerce responds that there is no evidence of quantitative
analysis tying the allocation method to the expenses.  See Def.'s
Mem. at 88.  Commerce asserts that NTN only quantified the

allocation itself and, therefore, the Court should sustain the agency's recalculation of NTN's United States indirect selling expenses.  See id.

Torrington supports Commerce and argues that NTN has not distinguished the current review from previous reviews in which the Court affirmed Commerce's recalculation of NTN's indirect selling expenses without regard to LOT.  See Torrington's Resp. at 49-50.

### C.    Analysis

The Court disagrees with NTN that it adequately supported its LOT adjustment claim for its reported United States indirect selling expenses.  Although NTN purports to show that it incurred different selling expenses at different trade levels, the evidence to which it points does not show that its allocation methodology reasonably quantifies the United States indirect selling expenses incurred at different LOTs.  See NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 131-33; NTN, 19 CIT at 1234, 905 F. Supp. at 1095. Given that NTN had the burden before Commerce to establish its entitlement to an LOT adjustment, its failure to provide the requisite evidence compels the Court to conclude that it has not met its burden of demonstrating that Commerce's denial of the LOT adjustment was not supported by substantial evidence and was not in accordance with law.  See NSK Ltd., 190 F.3d at 1330.

Accordingly, the Court denies NTN's remand request for recalculation of its margins using its reported United States indirect selling expense data.


**VIII. Constructed Export Price Profit Calculation Without Regard to Level of Trade**

   **A.    Background**

In calculating CEP, Commerce must reduce the starting price used to establish CEP by "the profit allocated to the expenses described in paragraphs (1) and (2)" of § 1677a(d).  19 U.S.C. § 1677a(d)(3).  Under 19 U.S.C. § 1677a(f), the "profit" that will be deducted from this starting price will be "determined by multiplying the total actual profit by [a] percentage" calculated "by dividing the total United States expenses by the total expenses."  Id. § 1677a(f)(1), (2)(A).  Section 1677a(f)(2)(B) defines "total United States expenses" as the total expenses deducted under § 1677a(d)(1) and (2), that is, commissions, direct and indirect selling expenses, assumptions, and the cost of any further manufacture or assembly in the United States.  Section 1677a(f)(2)(C) establishes a tripartite hierarchy of methods for calculating "total expenses."  First, "total expenses" will be "[t]he expenses incurred with respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country" if Commerce requested such expenses for the

purpose of determining NV and CEP.  Id. § 1677a(f)(2)(C)(i).  If Commerce did not request these expenses, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise."  Id. § 1677a(f)(2)(C)(ii).  If the data necessary to determine "total expenses" under either of these methods is not available, then "total expenses" will be "[t]he expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise."  Id. § 1677a(f)(2)(C)(iii). "Total actual profit" is based on whichever category of merchandise is used to calculate "total expenses" under § 1677a(f)(2)(C).  See id. § 1677a(f)(2)(D).

During this POR, NTN argued that profit levels differed by LOT and had an effect on prices and CEP profit and, therefore, Commerce should calculate CEP profit on an LOT-specific basis rather than for each class or kind of merchandise.  See Final Results, 62 Fed. Reg. at 2125.  NTN reasoned that § 1677a(f)(2)(C) "expresses a preference for the [CEP] profit calculation to be done as specifically as possible with respect to sales in the appropriate markets of the subject merchandise or the narrowest category of merchandise which includes the subject merchandise."  Id.

Commerce rejected NTN's argument, concluding that:

Neither the statute nor the SAA require us to calculate CEP profit on bases more specific than the subject merchandise as a whole. Indeed, while we cannot at this time rule out the possibility that the facts of a particular case may require division of CEP profit, the statute and SAA, by referring to "the" profit, "total actual profit," and "total expenses" imply that we should prefer calculating a single profit figure. NTN's suggested approach would also add a layer of complexity to an already complicated exercise with no guarantee that the result will provide any increase in accuracy. We need not undertake such a calculation (see Daewoo Electronics v. International Union, 6 F.3d 1511, 1518-19 (CAFC 1993)). Finally, subdivision of the CEP-profit calculation would be more susceptible to manipulation. Congress has specifically warned us to be wary of such manipulation of the profit allocation (see S. Rep. 103-412, 103d Cong., 2d Sess at 66-67).

Id.

## B.     Contentions of the Parties

NTN contends that Commerce erred by refusing to calculate CEP profit on LOT-specific basis. See NTN's Mem. at 17. Highlighting the "narrowest category of merchandise" language of § 1677a(f)(2)(C)(ii) and (iii), NTN again argues that there is a clear statutory preference that profit be calculated on the narrowest possible basis. See id. at 18. Moreover, NTN claims that since CV profit is calculated by LOT and matching is by LOT, CEP profit should be calculated to account for differences in LOT. See id. NTN asserts that the mere fact that a calculation is difficult is not a valid reason to sacrifice accuracy. See id. at 19. NTN further asserts that Commerce's speculation that an

adjustment is susceptible to manipulation provides no grounds for
rejecting an adjustment.  See id.  NTN, therefore, requests that
the Court remand the issue to Commerce to calculate CEP profit on
an LOT-specific basis.

Commerce responds that it properly determined CEP profit
without regard to LOT.  See Def.'s Mem. at 90.  Commerce notes,
inter alia, that § 1677a(f) does not refer to LOT, that is, the
statute does not require that CEP profit be calculated on an LOT-
specific basis.  See id. at 91.  In addition, Commerce asserts that
even assuming that a narrower basis for the CEP-profit calculation
is warranted in some circumstances, NTN has not provided any
factual support for such a deviation from Commerce's standard
methodology for calculating CEP profit.  See id. at 92.  Torrington
generally agrees with Commerce's CEP-profit calculation.  See
Torrington's Resp. at 51-53.

## C.   Analysis

Section 1677a(f), as Commerce correctly notes, does not make
any reference to LOT.  Accordingly, the Court's duty under Chevron
is to review the reasonableness of Commerce's statutory
interpretation.  See IPSCO, Inc. v. United States, 965 F.2d 1056,
1061 (Fed. Cir. 1992) (quoting Chevron, 467 U.S. at 844).

This Court upheld Commerce's refusal to calculate CEP on an

LOT-specific basis in <u>NTN Bearing</u>, 24 CIT at ___, 104 F. Supp. 2d at 133-35, finding it to be reasonable and in accordance with law. The Court examined the language of the statute and concluded that the statute clearly contemplates that, in general, the "narrowest category" will include the class or kind of merchandise that is within the scope of an investigation or review. The Court based its conclusion on its examination of subsections (ii) and (iii) of § 1677a(f)(C)'s "total expense" definition. Both subsections refer to "expenses incurred with respect to the narrowest category of merchandise . . . which includes the subject merchandise." The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, an order under this subtitle or section 1303 of this title, or a finding under the Antidumping Act, 1921." 19 U.S.C. § 1677(25).

Accordingly, as in <u>NTN Bearing</u>, the Court finds that Commerce reasonably interpreted § 1677a(f) in refusing to apply a narrower subcategory of merchandise such as one based on LOT. The Court, moreover, agrees with Commerce's conclusion that a "subdivision of the CEP-profit calculation would be more susceptible to manipulation," a result that Congress specifically warned Commerce to prevent. <u>Final Results</u>, 62 Fed. Reg. at 2125. Finally, even if the Court were to assume that a narrower basis for calculating CEP profit would be justified under some circumstances, the Court

agrees with Commerce that NTN failed to provide adequate factual support of how the CEP-profit calculation was distorted by Commerce's standard methodology.

IX.  **Commerce's Exclusion of Certain NTN Home-Market Sales to Affiliated Parties From the Normal Value Calculation; Exhaustion of Administrative Remedies**

A.  **Background**

During the POR, NTN made home-market sales to affiliated and unaffiliated parties.  In its preliminary analysis, Commerce conducted an arm's-length test to determine whether NTN's affiliated-party sales could be used for purposes of calculating NV.  See Commerce's Preliminary Results Analysis Mem. for NTN (Case No. A-588-804) (Sixth Administrative Review 5/1/94-4/30/95) at 6. Specifically, Commerce compared NTN's home-market selling prices to affiliated and unaffiliated parties for all classes and kinds of merchandise.  See id.  Commerce, in accordance with 19 U.S.C. § 1677b(f)(2), "disregarded sales of bearings to certain affiliated parties for certain classes or kinds of merchandise because [it] found that the net price of these products, when sold to these affiliated parties, was, on average, less than when these products were sold to unaffiliated parties."  Id.  Commerce stated that it "used sales to affiliated customers only where [it] determined such sales were made at arm's-length prices, i.e., at prices comparable to prices at which the firm sold identical merchandise to unrelated

customers." Preliminary Results, 61 Fed. Reg. at 35,717.


   B.   Contentions of the Parties

   NTN argues that Commerce erred in applying the arm's-length
test when it refused to use certain NTN sales to affiliated parties
in the NV calculation. See NTN's Mem. at 20. NTN asserts that
Commerce should have examined factors other than price in
determining whether affiliated and unaffiliated sales were
comparable before disregarding NTN's affiliated-party sales from
the NV calculation. See id.

   Commerce argues that pursuant to 19 C.F.R. § 353.38(c)(1)(ii),
(c)(2) (1995), if NTN disagreed with the agency's use of prices in
determining whether to use or disregard sales to affiliated
customers, NTN was obligated to raise the issue in its case brief
to the Final Results. See Def.'s Mem. at 93. Commerce, therefore,
asserts that the Court must reject NTN's untimely argument or, in
the alternative, sustain Commerce's arm's-length test because it is
supported by substantial evidence and in accordance with law. See
id. at 93-98. Torrington generally agrees with Commerce's
determination. See Torrington's Resp. at 53-58.

   In response, NTN asserts, inter alia, that it would have been
futile to raise the issue of looking at factors other than price
when determining price comparability at the administrative level

because Commerce refused to look at additional factors in prior administrative reviews.  See NTN's Reply Br. to Def. and Def.-Intervenor's Resps. to Koyo's Mot. J. Agency R at 16.


### C.    Analysis

The Court declines to require exhaustion here.  Regardless of whether it was futile for NTN to raise the issue at the administrative level since Commerce refused in prior reviews to consider looking at factors other than price, see, e.g., Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews, 61 Fed. Reg. 66,472, 66,511 (Dec. 17, 1996) (stating that "regulations direct us to focus on price"), the Court exercises its discretion to rule on the issue here.  The Court has repeatedly rejected the argument that Commerce should consider additional factors, that is, factors other than price, when determining whether sales prices to affiliated and unaffiliated parties are comparable.  The Court finds no basis under the circumstances of this case to depart from its prior holdings in NTN Bearing, 24 CIT at ___, 104 F. Supp. 2d at 148 and NTN, 19 CIT at 1241, 905 F. Supp. at 1099 (disagreeing "with NTN that Commerce's arm[']s-length test is flawed because Commerce did not take into account certain

factors proposed by NTN"). Accordingly, Commerce's application of the arm's-length test to exclude certain home-market sales to affiliated parties from the NV calculation is affirmed.

**X.   Commerce's Finding That NPB Failed to Correctly Indicate Whether a Bearing Model Was Further Manufactured in the United States During the Period of Review and Its Application of Total Facts Available to NPB**

   **A.   Background**

NPB reported that approximately one-third of its United States sales consisted of housed bearings that did not undergo further manufacturing in the United States. The other two-thirds of NPB's United States sales consisted of unhoused bearings which were exported to its United States affiliate, FYH Bearing Units USA ("FYH"), and further manufactured into housed bearings by FYH. All United States sales were CEP transactions.

In its questionnaire, Commerce asked NPB to indicate whether a bearing model was further manufactured in the United States during the POR. See Questionnaire for 1994-95 Administrative Review (7/6/95) (A-100-001) at C-5; 19 U.S.C. § 1677a(d). Commerce asked NPB to identify United States sales with the complete product code and a matching control number. See id. at C-5, C-6. For further-manufactured products, NPB was instructed to "report the control number of the product imported not the product sold." Id. at C-6 (emphasis supplied). The purpose of Commerce's instruction

was to enable it to distinguish sales of housed bearings that underwent further manufacturing in the United States from sales of housed bearing that did not require further manufacturing, and to enable Commerce to match United States sales and home-market sales. See Def.'s Mem. at 104.

In attempting to verify NPB's response, Commerce discovered that the reporting of sales of further-manufactured merchandise was inaccurate, and that there were omissions and other discrepancies in NPB's databases. See Final Results, 62 Fed. Reg. at 2087-90. Because of these problems, Commerce determined that the data provided by NPB's response could not be verified and Commerce could not calculate a dumping margin. See id.

Unable to verify NPB's response, Commerce resorted to total facts available under 19 U.S.C. § 1677e(a) (1994). Pursuant to § 1677e(b), Commerce decided to resort to adverse facts available and used a rate of 45.83 percent, reflecting the "all others" rate from the less than fair value ("LTFV") investigation. See Final Results, 62 Fed. Reg. at 2089. Commerce used an inference adverse to NPB upon finding that NPB failed to act to the best of its ability in responding to Commerce's requests for information.

### B. Contentions of the Parties

NPB contends that Commerce's application of total facts

available is unsupported by substantial evidence and is otherwise
not in accordance with law. See NPB's Mem. Supp. Mot. J. Agency R.
at 11. First, NPB contends that it properly assigned further-
manufacturing designations to products sold in the United States
and that these designations were verified as completely as
possible. See id. at 12. NPB claims that it maintained detailed
records identifying "the model code of every housed bearing
assembled in the United States and of every bearing and housing
used in assembly." Id. NPB argues that if a bearing was further
manufactured in the United States, records of the assembly were
available. See id. at 13. NPB states that no evidence
demonstrates that NPB incorrectly identified sales involving
further-manufactured bearings. See id. at 14. NPB also claims
that Commerce's requirement that it identify the bearing model "as
entered on a sale-by-sale basis" demands the impossible and departs
from Commerce's established practice. Id. at 15. NPB maintains
that its product-specific estimate of whether particular sales
involved further-manufactured bearings was reasonable. See id. at
18.

Second, NPB argues that Commerce's resort to total adverse
facts available was improper under the antidumping statute. See
id. at 20. NPB maintains that such action was improper because it
provided full and complete information and that Commerce's
"verification demonstrated that NPB correctly reported whether

every model sold in the United States was or was not further manufactured in the United States." Id. NPB argues that the fact that it "cannot demonstrate with metaphysical certainty whether the bearing involved in every particular sale entered U.S. customs territory attached to a housing or unattached to a housing" does not mean that it withheld information. Id. NPB objects to the use of adverse facts since it denies that it refused to cooperate and maintains that it acted to the best of its ability in all respects. See id. at 21. NPB attributes its inability to provide the requested information to the "commingling [of] merchandise, from multiple customs entries and from assembly in the United States, into inventory before a sale is made." Id. at 22. NPB also argues that information on the record should have been used rather than facts available from the LTFV investigation. See id. NPB concedes that certain sales are omitted, but claims that the "magnitude of omitted sales does not constitute significant omission." Id. at 26. NPB maintains that if facts available is to be applied at all, it should be applied only to omitted sales. See id. at 35.

Commerce responds that if it does not have accurate reporting of sales of further-manufactured merchandise, it cannot conduct the analysis necessary for the proper computation of CEP. See Def.'s Mem. at 105. The "proper identification of sales of further-manufactured merchandise allows Commerce to properly match sales in the United States and in the home market" in order to calculate

dumping margins.  <u>Id.</u>  Accurate data is necessary to correctly deduct the costs of further manufacturing and calculate CEP; if sales are misidentified, a lower deduction from CEP may result, benefitting the respondent.  <u>See id.</u> at 106.  At verification, Commerce found several reporting inaccuracies: (1) certain housed bearings entered the United States but were reported by NPB as unhoused bearings; (2) NPB's United States sales database was incomplete and inaccurate; and (3) NPB's home-market sales database was incomplete and inaccurate.  <u>See id.</u> at 106-114.  Because of these inaccuracies, Commerce argues that it properly resorted to total facts available.  <u>See id.</u> at 114.

Commerce further contends that its use of adverse facts was warranted.  <u>See id.</u> at 115.  Commerce argues that since it found that NPB did not act to the best of its ability to comply with Commerce's requests for information, it properly exercised it discretion to resort to adverse facts available.  <u>See id.</u> at 115-16.  Commerce also argues that its use of information from the LTFV investigation was proper under 19 U.S.C. § 1677e(b), which provides that Commerce may rely upon information derived from "'a final determination in the investigation under this title.'"  <u>Id.</u> at 117 (quoting 19 U.S.C. § 1677e(b)).  Commerce's use of the all others rate was aimed to ensure that NPB does not obtain a more favorable result than it would have by failing to provide timely, complete, and accurate responses and would also serve as an inducement to

comply with Commerce's requests in the future. <u>See id.</u> at 118.

Torrington argues that Commerce lawfully applied facts available information to calculate NPB's margins. <u>See</u> Torrington's Resp. at 59. Torrington claims that NPB does not contest any of the errors found by Commerce, but merely tries to convince the Court to overlook them. <u>See id.</u> at 60-61. Torrington argues that Commerce discovered the errors on a subset of data at verification, and this discovery permits Commerce to conclude that examination of the complete data would likely reveal more errors. <u>See id.</u> at 61.

### C. Analysis

The antidumping statute mandates that Commerce use "facts otherwise available" (commonly referred to as "facts available") if "necessary information is not available on the record" of an antidumping proceeding. 19 U.S.C. § 1677e(a)(1). In addition, Commerce may use facts available where an interested party or any other person: (1) withholds information that has been requested by Commerce; (2) fails to provide the requested information by the requested date or in the form and manner requested, subject to 19 U.S.C. § 1677m(c)(1), (e) (1994); (3) significantly impedes an antidumping proceeding; and (4) provides information that cannot be verified as provided in section 19 U.S.C. § 1677m(i). <u>See id.</u> § 1677e(a)(2)(A)-(D). Section 1677e(a) provides, however, that the use of facts available shall be subject to the limitations set

forth in 19 U.S.C. § 1677m(d).

Once Commerce determines that use of facts available is warranted, § 1677e(b) permits Commerce to apply an "adverse inference" if it can find that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  Such an inference may permit Commerce to rely on information derived from the petition, the final determination, a previous review or any other information placed on the record.  See 19 U.S.C. § 1677e(c) (1994).  When Commerce relies on information other than "information obtained in the course of the investigation or review, [Commerce] shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal."  Id.

In order to find that a party "has failed to cooperate by not acting to the best of its ability," it is not sufficient for Commerce to merely assert this legal standard as its conclusion or repeat its finding concerning the need for facts available.  See Ferro Union, Inc. v. United States, 22 CIT ___, ___, 44 F. Supp. 2d 1310, 1329 (1999) ("Once Commerce has determined under 19 U.S.C. § 1677e(a) that it may resort to facts available, it must make additional findings prior to applying 19 U.S.C. § 1677e(b) and drawing an adverse inference.").  Rather, to be supported by substantial evidence, Commerce must clearly articulate: (1) "why it

concluded that a party failed to comply to the best of its ability prior to applying adverse facts," and (2) "why the absence of this information is of significance to the progress of [its] investigation." Ferro, 22 CIT at ___, 44 F. Supp. 2d at 1331.

The Court finds that Commerce's decision to apply adverse facts available was supported by substantial evidence and in accordance with law. Commerce made extensive findings regarding NPB's refusal to provide accurate and complete information regarding sales of further-manufactured merchandise. See Final Results, 62 Fed. Reg. at 2087-2090; Memo to Laurie Parkhill Regarding NPB Verification Report (6/13/96) (A-588-804); Memo to Joseph A. Spetrini Regarding Preliminary Results for the Sixth Administrative Review (6/27/96) (A-588-804).

Commerce determined that the use of facts available was appropriate because it was unable to verify NPB's information. See Final Results, 62 Fed. Reg. at 2087. Under § 1677e, Commerce is authorized to decline to consider information necessary to its determination if the information submitted by a respondent cannot be verified or is so incomplete that it is unreliable. Complete information regarding further-manufactured merchandise is necessary to calculate the dumping duties; deficient information prevents Commerce from matching home-market to United States sales and in determining adjustments to CEP. Commerce's questionnaire asked NPB

to identify its further-manufactured sales with a model code and to identify the cost of further manufacturing on a model-specific basis.    See Questionnaire for 1994-95 Administrative Review (7/6/95) (A-100-001) at C-5, C-6.    NPB provided incomplete information for its home-market and United States sales databases and Commerce was unable to verify the information provided.    See Final Results, 62 Fed. Reg. at 2087.    Additionally, the information provided was found to be inaccurate.    During verification, examination of a sample of merchandise showed a contradiction between NPB's entry documents and its questionnaire response, and "NPB could not support the designation of these sales as being further-manufactured merchandise."    Id. at 2087-88.    As a result of the inaccuracies, Commerce could not calculate CEP, could not match approximately two-thirds of sales to the correct home-market model and could not employ its normal antidumping analysis.    See id. at 2088.    Consequently, Commerce's decision to resort to facts available was proper.

NPB maintains that the issue is not whether it failed to comply with Commerce's instructions but that the issue involves its "ability to identify with certainty whether or not the bearing component of housed bearings sold in the United States was attached to a housing at the time of importation."    NPB's Reply at 3.    NPB argues that because of the way it stores inventory, it cannot trace merchandise that is sold to particular customs entries and that

Commerce should determine the dumping margin based on sales instead of entries.  See id. at 4.  It is, however, NPB's responsibility to provide Commerce with data properly reflecting the nature of the merchandise entered into the United States and indicating whether it underwent any further manufacturing, irrespective of its method of storing inventory.  If NPB claims that certain merchandise has been further manufactured, it must provide support for its claim.

Commerce was also justified in using an inference adverse to NPB's interests.  Commerce made a specific finding that NPB failed to cooperate by not acting to the best of its ability in complying with requests for information.  See id.; 19 U.S.C. § 1677e(b).  In assessing NPB's ability to comply, Commerce considered NPB's familiarity with the review process and also found that NPB was in control of the data needed to make accurate dumping calculations. See id.  Commerce also considered that the use of NPB's flawed response would result in a reward to NPB for failing to cooperate. See id.

The Court also finds that Commerce's use of the all-others rate from the LTFV investigation was proper.  Commerce considered selecting one  of the following three rates: (1) the highest rate ever applicable to NPB (45.83%); (2) the last published rate of NPB (18%); or (3) the highest calculated rate in the instant review (22.32%).  See Memo to Joseph A. Spetrini Regarding Preliminary

Results for the Sixth Administrative Review (6/27/96) (A-588-804)
at 6.  Commerce selected the rate of 45.83%, which also represented
the "all others" rate and was based on the "average of calculated
margins from the [LTFV] investigation." Id.  Section § 1677e(b)
clearly provides that  an "adverse inference may include reliance
on information derived from . . . a final determination in the
[antidumping] investigation."  Because the 45.83% rate was derived
from the LTFV investigation, Commerce's selection of that rate is
reasonable and in accordance with law.  Additionally, Commerce's
selection of the highest rate so that NPB would not benefit from
its lack of cooperation and so that NPB would have an incentive to
cooperate  in  future  reviews  was  reasonable.    Accordingly,
Commerce's determination is affirmed.


**XI.  Commerce's Treatment of Certain Discounts, Rebates and
     Billing Adjustments Reported by Koyo, NTN and NSK**

   **A.   Background**

   Koyo's Home-market Billing Adjustments

   Commerce  accepted  certain  model-  or  transaction-specific
billing adjustments claimed by Koyo in field BILLADJ-1H.  See
Memorandum to The File Regarding Analysis Methodology Used to
Determine Dumping Margins for Koyo (7/8/96) (A-588-804).   The
adjustments  claimed  in  field  BILLADJ-1H  were  reported  through
customer-wide allocations.  In accepting the adjustments reported

in Koyo's BILLADJ-1H field, Commerce stated the following:

> We agree with Koyo that we should treat its billing
> adjustment as a direct adjustment to NV. We determined
> at the home[-]market verification that in preparing its
> response to [Commerce] Koyo summed, on a customer-
> specific basis, the amount of this adjustment, which was
> only granted on in-scope merchandise, and then allocated
> the customer-specific total expense over in-scope
> merchandise on a customer-specific basis. Koyo acted to
> the best of its ability in reporting this information
> using customer-specific allocations. . . . [T]he
> customer-specific allocation methodology it used to
> report this expense to the Department was not
> unreasonably distortive.

Final Results, 62 Fed. Reg. at 2096.


### Koyo's Home-market Rebates

Koyo granted rebates to its distributors on a customer-specific basis. Koyo calculated a single factor for a customer "by dividing the total rebate payments to the distributor in the POR by the total sales during that period of bearings and bearing-related products." Questionnaire for 1994-95 Administrative Review (9/27/95) (A-588-804) Koyo Sec. B Resp. at 20. In accepting Koyo's rebates, Commerce stated the following:

> During the verification of Koyo's rebates, we noted that,
> once a distributor participating in the rebate program
> had purchased a pre-established amount of sales, Koyo
> applied a pre-established percentage rebate to all sales
> of that distributor. Therefore, reporting the percentage
> is the equivalent of reporting its rebates on a
> transaction-specific basis because the rebate was granted
> as a fixed and constant percentage of all affected sales.
> . . . Therefore, we determine that Koyo acted to the best
> of its ability and that its response methodology is not
> unreasonably distortive.

Final Results, 62 Fed. Reg. at 2096.

NTN's Home-market Billing Adjustments

NTN reported certain home-market billing adjustments on an allocated basis. In accepting the adjustments, Commerce stated the following:

> NTN's reporting methodology was consistently customer-
> and product-specific for billing adjustments.  As a
> result of our verification of NTN's HM sales, we found
> that NTN reported the great majority of billing
> adjustments on a transaction-specific basis. . . . [W]e
> prefer transaction-specific amounts for these kinds of
> adjustment claims.  Because NTN acted to the best of its
> ability in reporting the adjustments and its allocations
> were not unreasonably distortive, we have accepted the
> reported adjustments for the final results.

Final Results, 62 Fed. Reg. at 2097.

NSK's Home-market Rebates

NSK reported lump-sum rebates to certain customers on a customer-specific basis.  See Questionnaire for 1994-95 Administrative Review (9/27/95) (A-588-804) NSK Sec. B Resp. at B-22, B-23.  Such rebates were paid on the basis of subject and non-subject merchandise. In accepting the adjustments, Commerce stated the following:

> We agree with NSK that we should treat its lump-sum
> rebates as a direct adjustment to NV.  Although NSK
> allocates these rebates on a customer-specific basis, we
> determine that NSK acted to the best of its ability in
> reporting this information using customer-specific
> allocations. Our review of the information NSK submitted
> and our findings at verification indicate that, given the
> lump-sum nature of this adjustment, the fact that NSK's
> records do not readily identify a discrete group of sales
> to which each rebate pertains, and the extremely large

number of POR sales NSK made, it is not feasible for NSK to report this adjustment on a more specific basis.

We also do not find that the customer-specific POR-allocation methodology NSK used shifts expenses incurred on sales of out-of-scope merchandise to sales of in-scope merchandise or that it is otherwise unreasonably distortive. . . . [W]e find that it is likely that NSK granted this adjustment in proportionate amounts with respect to sales of out-of-scope and in-scope merchandise.

Final Results, 62 Fed. Reg. at 2092.

### B.    Contentions of the Parties

Torrington alleges that Commerce improperly accepted Koyo's home-market billing adjustments and home-market support rebates, as well as NTN's home-market billing adjustments and NSK's home-market support rebates.  Torrington maintains that the CAFC has clearly defined "direct" adjustments to price as those that "vary with the quantity sold, or that are related to a particular sale," and Commerce cannot treat adjustments that do not meet this definition as direct.  Torrington's Mem. Supp. Mot. J. Agency R. at 12 (citing Torrington Co. v. United States ("Torrington CAFC"), 82 F.3d 1039, 1050 (Fed. Cir. 1996) (quotations omitted)).  Torrington contends that here Commerce "redefined 'direct' to achieve what Torrington CAFC had previously disallowed" by allowing respondents to report allocated post-sale price adjustments ("PSPAs") if they acted to the best of their abilities in light of their record-keeping systems and the results were not unreasonably distortive.  Id. at 14.  Torrington acknowledges that this Court has already approved

of Commerce's practice as applied under post-URAA law in <u>Timken Co.</u>
<u>v. United States</u> ("<u>Timken</u>"), 22 CIT ___, 16 F. Supp. 2d 1102
(1998), but asks the Court to reconsider its approval. <u>See</u>
Torrington's Reply at 6-7.

Furthermore, Torrington maintains that the amendments to the
URAA did not modify the distinction between direct and indirect
adjustments established under pre-URAA law such as <u>Torrington CAFC</u>.
<u>See</u> Torrington's Mem. at 16 (citing 19 U.S.C. § 1677a(d)(1)(B), (D)
(1994) and § 1677b(a)(7)(B) (1994)). Torrington is not convinced
that the SAA contradicts its contentions. <u>See id.</u> at 17 (citing
SAA at 823-24).

Torrington also contends that even under its new methodology,
Commerce's determination was not supported by substantial evidence
inasmuch as respondents failed to show that: (1) their reporting
methods did not result in distortion; and (2) they put forth their
best efforts to report the information on a more precise basis.
<u>See id.</u> at 22. Torrington emphasizes that respondents have the
burden of showing non-distortion and best efforts, and having
failed to carry the burden, they must not benefit from the
adjustment. <u>See id.</u> at 23. Torrington, therefore, requests that
this Court reverse Commerce's determination with respect to the
various PSPAs and remand the case to Commerce with instructions to
disallow all of the claims. <u>See id.</u> at 24.

Commerce responds that its treatment of the adjustments is consistent with current law. See Def.'s Mem. at 119. Even though the adjustments were not reported in a transaction-specific manner, Commerce accepted them as part of its new policy to accept allocated adjustments where it is not feasible for the respondent to report them on a transaction-specific basis and the respondent has acted to the best of its ability. See id. at 128. Additionally, Commerce examines whether the allocation method used is not unreasonably distortive pursuant to 19 U.S.C. § 1677m(e). See id. at 128-29.

Commerce argues that Torrington erred in relying on Torrington CAFC because the case does not stand for the proposition that direct price adjustments may only be accepted when they are reported on a transaction-specific basis. See id. at 134. Rather, the Torrington CAFC court "merely overturned a prior Commerce practice . . . of treating certain allocated price adjustments as indirect expenses," id. (citing Torrington CAFC, 82 F.3d at 1047-51), and does "not address appropriate allocation methodologies" used in reporting the price adjustments in question, id. at 134-35 (quoting Final Results, 62 Fed. Reg. at 2091). Also contrary to Torrington's assertion, Commerce did not consider Torrington CAFC as addressing proper allocation methodologies; rather, Commerce only viewed Torrington CAFC as holding that "Commerce could not

treat as indirect selling expenses 'improperly' allocated price adjustments." Id. at 136. Commerce notes that pursuant to its new methodology, it does not consider price adjustments to be any type of selling expense, either direct or indirect, and, therefore, Torrington's argument is not only without support, but also inapposite to Torrington CAFC. See id. at 136-37.

Additionally, Commerce argues that its findings are supported by substantial evidence. See id. at 139. With respect to Koyo's BILLADJ-1H and rebates, Commerce maintains that: "(1) Koyo had reported the adjustments on the most specific basis possible and, thus, had cooperated to the best of its ability, and (2) that the allocation method was not distortive." Id. at 140 (quoting Final Results, 62 Fed. Reg. at 2096). Koyo reported BILLADJ-1H adjustments on a customer-specific basis and limited them to in-scope merchandise. See id. Commerce argues that it "verified the manner in which Koyo maintained its normal records and confirmed that Koyo's reporting was reasonable in light of its records." Id. at 142. Because Commerce found that its allocation reflects Koyo's normal books and records, is limited to in-scope merchandise and is granted on a customer-specific basis, Commerce believes that it acted reasonably in accepting the adjustment. See id.

Commerce also argues that it properly accepted Koyo's home-market rebates. See id. at 143. Commerce found no evidence that

Koyo's adjustments were granted disproportionately on out-of-scope merchandise, and instead found that Koyo's method accurately apportioned to each sale the amount of the rebate for which the sale was responsible. See id. Commerce maintains that "reporting a rebate earned on a group of sales by spreading it over those sales is the most accurate way to report such a rebate." Id. at 144.

With respect to NTN's home-market billing adjustments, Commerce maintains that NTN's reporting "involves a very small number of transactions, which have been allocated on an extremely narrow basis, and under circumstances in which Commerce found that NTN simply could not determine the specific transactions to which these adjustments should be linked." Id. at 147. Commerce argues that NTN acted to the best of its ability in reporting the adjustment and that the method used was not unreasonably distortive. See id. at 147-48.

Commerce argues that it properly accepted NSK's lump-sum rebates as well. See id. at 148. At verification, Commerce determined that the rebates were granted on a customer-specific basis rather than on the basis of any particular transaction or product. See id. Commerce also found that NSK could provide information supporting the calculation and that the method was not unreasonably distortive. See id.

Koyo, NSK and NTN generally concur with Commerce's position. See Koyo's Mem. Resp. to Torrington's Mot. J. Agency R.; NSK's Mem. Opp'n to Torrington's Mot. J. Agency R; NTN's Resp. to Torrington's Mot. J. Agency R.

## C.    Analysis

Commerce's decision to accept Koyo's, NSK's and NTN's billing adjustments was supported by substantial evidence and was fully in accordance with the post-URAA statutory language, as well as with the SAA that accompanied the enactment of the URAA because: (1) Commerce verified the adjustments to determine that they were reliable and could not be reported more specifically; (2) Commerce properly determined that respondents acted to the best of their abilities in reporting the adjustments; and (3) Commerce properly accepted the allocation methodologies of the respondents after carefully reviewing the differences between such merchandise and ensuring that the allocations were not unreasonably distortive. See Final Results, 62 Fed. Reg. at 2094-96.

After the enactment of the URAA, Commerce reevaluated its treatment of PSPAs, and since that time it treats them as adjustments to price and not as selling expenses.    Indeed, Commerce's treatment of the home-market support rebates, early-payment discounts and billing adjustments as adjustments to price

instead of selling expenses is the issue left unanswered by the pre-URAA cases upon which Torrington relies, namely, Torrington CAFC; Koyo Seiko Co. v. United States ("Koyo"), 36 F.3d 1565 (Fed. Cir. 1994); and Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.("Consumer Products"), 753 F.2d 1033 (Fed. Cir. 1985).[6]

The Court disagrees with Torrington that Torrington CAFC mandates that direct price adjustments may only be accepted when they are reported on a transaction-specific basis.  Rather, as Commerce correctly pointed out, Torrington CAFC merely overturned a prior Commerce practice of treating certain allocated price adjustments as indirect selling expenses and did not address the propriety of the allocation methods that respondents used in reporting the price adjustments in question.  See Final Results, 62 Fed. Reg. at 2091.  Although (1) "Commerce treated rebates and billing adjustments as selling expenses in preceding reviews under

---

[6] In Torrington CAFC, the Court of Appeals did not hold that billing adjustments must be treated as selling expenses.  The Torrington CAFC court specifically noted that it was treating billing adjustments as selling expenses only because there was no argument offered suggesting otherwise, and the issue whether such treatment was appropriate remained open. Torrington CAFC, at 1050 n.15.  Torrington's reliance on Koyo and Consumer Products is equally unjustified.  The Koyo court, citing Consumer Products, noted that "[d]irect selling expenses are 'expenses which vary with the quantity sold, such as commissions'" and did not address the issue of billing adjustments.  Koyo, 36 F.3d at 1569 n.4 (quoting Consumer Products, 753 F.2d at 1035).  Because these cases address Commerce's treatment of selling expenses, and Commerce did not treat the adjustments at issue as selling expenses, these cases are irrelevant to the issue at hand.

pre-URAA law," and (2) "previously decided that such adjustments are selling expenses and, therefore, should not be treated as adjustments to price," this did not "preclude Commerce's change in policy or this Court's reconsideration of its stance in light of the newly-amended antidumping statute [(that is, 19 U.S.C. § 1677m(e) (1994))]." Timken, 16 F. Supp. 2d at 1107. "Neither the pre-URAA nor the newly-amended statutory language imposes standards establishing the circumstances under which Commerce is to grant or deny adjustments to NV for PSPAs." Id. at 1108 (citing Torrington CAFC, 82 F.3d at 1048). Moreover, 19 U.S.C. § 1677m(e) "specifically directs that Commerce shall not decline to consider an interested party's submitted information if that information is necessary to the determination but does not meet all of Commerce's established requirements, if the [statute's] criteria are met." Id.

Commerce applied its post-URAA methodology to analyze adjustments to price, explaining that Commerce accepted PSPAs as direct adjustments to price if Commerce determined that a respondent, in reporting these adjustments, acted to the best of its ability to associate the adjustment with the sale on which the adjustment was made, rendering its reporting methodology not unreasonably distortive. See Final Results, 62 Fed. Reg. at 2090. In evaluating the degree to which an allocation over scope and non-scope merchandise may be distortive, Commerce examines "the extent

to which the out-of-scope merchandise included in the allocation pool is different from the in-scope merchandise in terms of value, physical characteristics, and the manner in which it is sold." Id. Torrington argues that Commerce's methodology is unlawful. See Torrington's Reply at 9-12. Torrington is incorrect. Although the URAA does not compel Commerce's new policy on price adjustments, the statute does not prohibit Commerce's new practice.

Commerce's "change in policy . . . substitutes a rigid rule with a more reasonable method that nonetheless ensures that a respondent's information is reliable and verifiable." Timken, 16 F. Supp. 2d at 1108. Commerce's decision to accept SKF's and NTN's allocated adjustments to price is acceptable, "especially . . . in light of the more lenient statutory instructions of [19 U.S.C. § ] 1677m(e)." Id. Accordingly, "Commerce's decision to accept the PSPAs . . . is fully in accordance with the post-URAA statutory language and directions of the SAA," and the decision to accept SKF's, NTN's and INA's adjustments was reasonable even though the adjustments were not reported on a transaction-specific basis and even though the allocations included rebates on non-scope merchandise. Id.

Torrington argues that the post-URAA statute retains the distinction between "direct" and "indirect" expenses and, therefore, does not permit Commerce to alter its treatment of

adjustments to price.  See Torrington's Reply at 6-8.  Torrington

trivializes the statutory changes that prompted Commerce to

reevaluate its treatment of adjustments and consequently revise its

regulations.  Because Commerce now treats PSPAs as adjustments to

price rather than selling expenses, the distinction between direct

versus indirect selling expenses is no longer relevant for the

purpose of determining the validity of allocated price adjustments.

One of the goals of Congress in passing the URAA was to liberalize

certain reporting requirements imposed on respondents in

antidumping reviews.  Such intent is evident both in the amendments

enacted by the URAA and in the SAA.   The URAA amended the

antidumping law to include a new subsection, 19 U.S.C. § 1677m(e).

The provision states that:

> In reaching a determination under [19 U.S.C.] section
> 1671b, 1671d, 1673b, 1673d, 1675, or 1675b . . . the
> administering authority and the Commission shall not decline
> to consider information that is submitted by an interested
> party and is necessary to the determination but does not meet
> all the applicable requirements established by the
> administering authority or the Commission, if—-
> (1) the information is submitted by the deadline
> established for its submission,
> (2) the information can be verified,
> (3) the information is not so incomplete that it cannot
> serve as a reliable basis for reaching the applicable
> determination,
> (4) the interested party has demonstrated that it
> acted to the best of its ability in providing the
> information and meeting the requirements
> established by the administering authority or the
> Commission with respect to the information, and
> (5) the information can be used without undue
> difficulties.

19 U.S.C. § 1677m(e).  This section of the statute liberalized Commerce's general acceptance of data submitted by respondents in antidumping proceedings by directing Commerce not to reject data submissions once Commerce concludes that the specified criteria are satisfied.[7]

Next, Torrington suggests that Commerce has accepted the adjustments without requiring respondents to carry the burden of proving that the adjustments are non-distortive.  See Torrington's Mem. at 23.  This argument is without merit.  As a routine part of its antidumping practice, Commerce accepts a range of reporting methodologies and allocations adopted by respondents.  The mere acceptance of an adjustment as reported cannot be a sufficient ground for rejecting Commerce's decision.  It would be anomalous indeed to expect a respondent to provide Commerce, in addition to the information on the basis of which Commerce could conclude that the respondent's reporting methods are not distortive, with a proof of the validity of Commerce's determination of that sort.  Such a scheme would effectively allow the respondent to bind Commerce,

---

[7] Consistent with § 1677m(e), the SAA states that "[t]he Administration does not intend to change Commerce's current practice, sustained by the courts, of allowing companies to allocate these expenses when transaction-specific reporting is not feasible, provided that the allocation method used does not cause inaccuracies or distortions." SAA at 823-24.  Therefore, the statute and the accompanying SAA both support Commerce's use of allocations in circumstances such as those present here.

restricting Commerce's inherent power to investigate, examine and render a decision.

In determining whether Koyo's, NSK's and NTN's allocation over scope and non-scope merchandise was unreasonably distortive, Commerce reasonably has not required respondents to demonstrate the non-distortive nature of the allocation directly, for example, by compelling them to identify separately the adjustments on scope merchandise and compare them to the results of allocations over both scope and non-scope merchandise.  Such a burdensome exercise would defeat the entire purpose underlying the more flexible reporting rules, by compelling the respondent to go through the enormous effort that the new rules were intended to obviate. Rather, Commerce has adopted criteria by which Commerce itself could determine whether an allocation over scope and non-scope merchandise was likely to cause unreasonable distortions.

In the case at hand, Commerce's determination with respect to Koyo's billing adjustments was reasonable.  Commerce premised its conclusion on its finding that the customer-wide allocations by Koyo of the price adjustments were not unreasonably distortive, having been "only granted on in-scope merchandise" and then allocated over in-scope merchandise on a customer-specific basis. <u>Final Results</u>, 62 Fed. Reg. at 2096.  Commerce also found that Koyo

acted to the best of its ability in reporting the information. See id.

Commerce also properly accepted Koyo's home-market rebates. Koyo's home-market rebates were granted on a customer-specific basis. See id.; Questionnaire for 1994-95 Administrative Review (9/27/95) (A-588-804) Koyo Sec. B Resp. at 20. These rebates were granted as a fixed and constant percentage of all affected sales, a method entirely proper under the law and consistent with Commerce's policy. See id. Commerce also found that Koyo acted to the best of its ability and that the method was not unreasonably distortive. See id.

Commerce's determination with respect to NTN was reasonable. Commerce premised its determination on its finding that NTN reported the adjustment on a basis that was consistently customer- and product-specific. See id. at 2097. Moreover, Commerce determined that NTN acted to the best of its ability in reporting the adjustments and that the method was not unreasonably distortive. See id.

Additionally, Commerce was justified in concluding that NSK's reporting of its home-market rebates on a customer-specific basis was proper. Commerce considered the large number of transactions, NSK's records and the lump-sum nature of the adjustment and

concluded that it is not feasible for NSK to report the adjustment on a more precise basis. See id. at 2092. Commerce also determined that the allocation methodology was not unreasonably distortive. See id.

Torrington asserts that Commerce improperly determined that Koyo, NTN and NSK acted to the best of their ability in reporting adjustments. See Torrington's Mem. at 23-29. Torrington's assertion is without merit. When respondents' adjustments were granted over both scope and non-scope merchandise without reference to any particular model or transaction, Commerce could not have reasonably expected them to be recorded or reported to Commerce in a manner more specific than that which was used. It was equally appropriate for Commerce to consider, as a part of its decision whether respondents acted to the best of their ability in reporting the adjustments, the volume of adjustments when deciding whether it is feasible to report these adjustments on a more specific basis. In light of the considerable size of their databases, Commerce reasonably found that "given the extremely large volume of transactions involved in these AFBs reviews[,] [i]t is inappropriate to reject allocations that are not unreasonably distortive in favor of facts otherwise available where a fully cooperating respondent is unable to report the information in a more specific manner." Final Results, 62 Fed. Reg. at 2090. The large volume of data is precisely one of the factors that one would

expect Commerce to consider in deciding whether a respondent has acted to the best of its ability in reporting a given adjustment.

In sum, the Court finds that Commerce's decision to accept Koyo's, NTN's and NSK's reported home-market adjustments was supported by substantial evidence and was fully in accordance with the post-URAA statutory language and the SAA. The record demonstrates that the requirements of 19 U.S.C. § 1677m(e) were satisfied by the respondents in that: (1) the reported adjustments were submitted in a timely fashion, see 19 U.S.C. § 1677m(e)(1); (2) the information submitted was verified by Commerce; (3) the respondents' information was not so incomplete that it could not serve as a basis for reaching a determination, see 19 U.S.C. § 1677m(e)(3); (4) respondents demonstrated that they acted to the best of their abilities in providing the information and meeting Commerce's new reporting requirements, see § 1677m(e)(4); and (5) there was no indication that the information was incapable of being used without undue difficulties. See § 1677m(e)(5).

Commerce's determinations with respect to Koyo, NTN and NSK were also consistent with the SAA. The Court agrees with Commerce's finding in the Final Results that given the extremely large volume of transactions, the level of detail contained in normal accounting records, and time constraints imposed by the statute, the reporting and allocation methodologies were

reasonable.  This is consistent with the SAA directive under §
1677m(e), which provides that Commerce "may take into account the
circumstances of the party, including (but not limited to) the
party's size, its accounting systems, and computer capabilities."
SAA at 865.   Thus, the Court finds that Commerce properly
considered the ability of Koyo, NTN and NSK to report its billing
adjustments on a more specific basis.   Accordingly, the Court
concludes that Commerce's acceptance of Koyo's, NTN's and NSK's
reported adjustments was supported by substantial evidence and
fully in accordance with law.

**CONCLUSION**

This case is remanded to Commerce to: (1) exclude any transactions that were not supported by consideration from NSK's United States sales database and to adjust the dumping margins accordingly; (2) reconsider the issue of NSK's relationship to its supplier; (3) reconsider its determination that a certain model of Koyo's was outside the ordinary course of trade; and (4) reconsider its determination that a certain home-market ball bearing of Koyo's could be compared to United States sales because it is a foreign like product and to clearly articulate the basis of its determination.

 

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated:     June 6, 2001
             New York, New York